628 A.2d 398

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Richard CARROLL.**

Superior Court of Pennsylvania.

Argued April 19, 1993.

Filed July 2, 1993.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Commonwealth, appellant.

Paul M. George, Asst. Public Defender, Philadelphia, for appellee.

Before: CAVANAUGH, WIEAND, McEWEN, CIRILLO, DEL SOLE, BECK, TAMILIA, JOHNSON and HUDOCK, JJ.

CIRILLO, Judge.

This is an appeal by the Commonwealth from a pre-trial order of the Court of Common Pleas of Philadelphia County suppressing the introduction of 47 packets of narcotics at the trial of Richard Carroll.[1] We reverse.

Carroll was arrested, without a warrant, on November 22, 1989, and charged with possession of a controlled substance and possession of a controlled substance with the intent to deliver.

At 11:21 a.m. on November 22, two uniformed police officers, Joseph Milligan and John Reinecker, while on routine patrol in a marked police vehicle, saw two men standing on the sidewalk of Olive Street, Philadelphia. Officer Reinecker told Officer Milligan he wanted to investigate one of the men, and gave no reason.

Both officers left the patrol car and Officer Reinecker spoke to the man he had suggested investigating. The second man, Carroll, stood with his hands in the pockets of his jacket. Officer Milligan, with his hand over his gun, approached Carroll and started to ask him to take his hands out of his pockets.

Carroll turned and fled into an alley on the west side of Olive Street, slipped and fell in the debris. Officer Milligan followed Carroll and at a distance of a 10 to 15 feet saw two brown tinted, heat-sealed packets containing a white substance fall from Carroll's pocket into the debris in the alley.

Officer Milligan approached Carroll who was still face down in the debris in the alley, drew his gun, and told Carroll to stay on the ground with his hands behind his back. Officer Milligan put handcuffs on the still prone Carroll, arrested him, and searched his coat pockets, finding 45 additional brown tinted packets. Officer Milligan patted Carroll down a second time in a search for weapons and then retrieved the two dropped brown tinted packets from the debris. After Carroll

---

1. The Commonwealth has certified that the suppression substantially handicaps the prosecution. *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985).

was taken to the police station, a custodial search revealed $404.00 in cash.

The Commonwealth disputes several of the suppression court's findings. The Commonwealth argues Officer Milligan did not have his hand on his gun, that he did not pursue Carroll, and that he did not approach Carroll until after he had fallen and dropped the drugs.

When we review a suppression ruling, we are bound by the reasonable factual findings of the suppression court, *Commonwealth v. Hamlin*, 503 Pa. 210, 469 A.2d 137 (1983), unless we find an abuse of discretion or an error of law. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985). Credibility determinations may not be disturbed on appeal. *Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986). We are, therefore, despite the Commonwealth's vigorous argument to the contrary, bound to accept the reasonable factual findings of the suppression court. *Hamlin, supra; Whitney, supra.*

Under questioning by the assistant district attorney at the suppression hearing Officer Milligan testified that he had his hand on his gun when he approached Carroll.

Q: [A]t what point in what happened did you draw your gun specifically in relationship to where you saw the packets go to the ground?

A: Well, when he started to run, actually I had my hand on the gun because he had his hands in his pockets. But, it happened so fast and I drew my gun as he was laying on the ground and after the packets were on the ground.

When we look at the testimony we are persuaded that the suppression court's finding of fact that Officer Milligan had his hand on his holstered gun when he chased Carroll is reasonable. *Hamlin, supra; Whitney, supra.*

The question before this court is whether the police officer's pursuit of Carroll was a seizure. If it was not a seizure then the drugs were lawfully found and finding the drugs in these circumstances gave rise to the probable cause to arrest and search Carroll. If the pursuit was a seizure, then when Carroll dropped or discarded the drug packets the abandon-

ment was impermissibly coerced. If the drugs were abandoned after seizure, then the officer must demonstrate that he had either probable cause to make the seizure reasonable or a reasonable suspicion for a *Terry* stop and frisk.

This case raises the question of whether Pennsylvania will follow the federal constitutional definition of seizure recently adopted in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), or will continue to follow a line of Pennsylvania cases which afford a suspect a greater degree of protection under the state constitution.[2]

## Seizure under the Fourth Amendment to the U.S. Constitution

Seizure was defined by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion) and adopted by the U.S. Supreme Court in *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988): "A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." This has become known as the *Mendenhall* reasonable person test for when a seizure occurs.

The definition adopted in *Chesternut* followed from the formulation in *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct.

**2.** Two Pennsylvania cases decided since the *Hodari D.* decision have not created a straight line pointing to a decision. In *Commonwealth v. Peterfield*, 415 Pa.Super. 313, 609 A.2d 540, *appeal denied* 533 Pa. 609, 618 A.2d 400 (1992), over the "vehement" dissent of Judge Ford Elliott, Judge Kelly reasoned that *Hodari D.* compelled the finding that there was no seizure. The third panel member concurred in the result. In *Peterfield* a passerby alerted a police officer that someone was "acting suspiciously," the officer approached and with a show of authority ordered the actor to "stand fast." Peterfield fled, leaving behind an unregistered, loaded .25 caliber automatic handgun. The dissent argued in *Peterfield*, as does the dissent in this case, that Pennsylvania constitutional jurisprudence afford citizens greater protections of privacy than does the Fourth Amendment.

The recent decision of a panel of this court in *Commonwealth v. Harper*, 416 Pa.Super. 608, 611 A.2d 1211 (1992), although raising the same factual issues, was decided in conformity with *Hodari D.* solely on federal constitutional grounds without considering the question of a divergence of state and federal constitutional protections.

1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."

In *Hodari D., supra,* the Supreme Court held that pursuing a fleeing suspect is not a seizure for Fourth Amendment purposes; therefore, a rock of cocaine discarded during the pursuit was not the fruit of an illegal seizure and need not be suppressed as evidence at trial.

The more narrow question in *Hodari D.* was whether a "show of authority" without more is a seizure. The court held that it was not. An arrest requires either physical force or submission to the assertion of authority. *Id.* 499 U.S. at ——, 111 S.Ct. at 1551. There is no seizure based on show of authority unless it is complied with. *Id.,* citing *Brower v. Inyo County,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). No search or seizure occurs when a police officer examines abandoned materials, even if the act of abandonment occurs during a police chase. *Hodari D.,* citing *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

In *Hodari D.,* when the officers began their pursuit they did not have a lawful basis for either stopping or arresting the suspects. *Hodari D.* holds that a show of authority alone is not seizure; only if the subject submits to the show of authority or if the police officer makes contact with the subject is there a seizure. *Id.* 499 U.S. at ——, 111 S.Ct. at 1548.

Thus, *Hodari D.* modifies the *Mendenhall* reasonable person test, a person is seized when he reasonably believes he is not free to leave, to hold that seizure is not effected until an officer has used physical restraint or the citizen has submitted to a show of authority. Since *Hodari D.,* for Fourth Amendment purposes, a show of authority alone is not a seizure.

In the case at hand, under the criteria of *Hodari D.* there was no seizure at the time the packets of cocaine fell out of Carroll's pockets. There was a "show of authority" without the requisite submission to create a seizure. *Hodari D., supra.*

**Seizure under Art. I, Section 8 of the Pennsylvania Constitution**

Finding as we do that the pursuit of Carroll was not a seizure in terms of the Fourth Amendment, *Hodari D., supra,* we turn now to the question of whether Carroll or the drugs were seized in violation of the Pennsylvania Constitution. The Pennsylvania Constitution may afford greater protections than the U.S. Constitution. *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991) (declining to the adopt the "good faith" exception to the exclusionary rule). It is "important and necessary to undertake an independent analysis of the Pennsylvania Constitution each time a provision of that fundamental document is implicated." *Id.* at 389, 586 A.2d at 894–95.

The *Edmunds* court outlined the steps to an independent analysis of state constitutional grounds which are: an examination of the text of the constitutional article, the history of its application, the jurisprudence of the question in other states, and the policy considerations behind the constitutional provision. *Id.*

Article I, section 8 of the Pennsylvania Constitution provides:

**Security from Searches and Seizures**
Section 8. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or thing shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Const. Art. I, § 8.

One of the first Pennsylvania cases to consider the exclusionary rule after *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) made it applicable to the states was *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963). In *Bosurgi,* the Pennsylvania Supreme Court adopted *Mapp* which prohibits use of evidence which is the product of an unreasonable search or seizure. *Id.* 411 Pa. at 65, 190 A.2d at

8

309. The *Bosurgi* court read *Mapp* as allowing each state to make an independent assessment of what was a "reasonable search and seizure." *Id.* 411 Pa. at 65, 190 A.2d at 309. The issue in *Bosurgi* was whether a warrantless search based on a vague description was reasonable. The court found that it was because the subject acquiesced or submitted to the search. *Bosurgi* suggests that the state jurisprudence of search and seizure has been co-extensive with the jurisprudence of the Fourth Amendment; but *Bosurgi* reserved to the state the right to define what is a reasonable search or seizure.

Pennsylvania courts have not hesitated to articulate separate state constitutional grounds for their holdings. *See Edmunds, supra; see also Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982) (death penalty jurisprudence co-extensive); *Commonwealth v. Henderson,* 496 Pa. 349, 437 A.2d 387 (1981) (interested-adult rule protecting minors from self-incrimination has its foundation in state law); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975) (separate Pennsylvania constitutional grounds for *Miranda*). When confronted with a federal precedent which appears to alter state precedent, the state court must re-examine the source of the Pennsylvania precedent. *Edmunds, supra.*

The Pennsylvania Supreme Court considered the question of whether police pursuit created forced or coerced abandonment in *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973). Jeffries "quickened his pace" walking on the sidewalk when a police car pulled along side. Police observation quickly turned to pursuit when Jeffries ran. He discarded a jacket during the chase which, it was found, had foil packets of heroin in the pocket. *Id.* at 322, 311 A.2d at 916. The court held that flight alone is neither probable cause for arrest, nor is it alone reasonable suspicion to justify a *Terry* stop and frisk. *Id.* 454 Pa. at 325, 311 A.2d at 917. The court held without probable cause or articulable suspicion, the police have unlawfully coerced the abandonment of the incriminating property. *Id.* at 326, 311 A.2d at 918.

The Pennsylvania Supreme Court found in *Commonwealth v. Jones,* 474 Pa. 364, 378 A.2d 835 (1977), that when the police order a citizen to stop a seizure has occurred. *Id.* at 371, 378 A.2d at 839. The court found that seizure is judged in the totality of the circumstances, including the demeanor and the words of the police officer and the location of the encounter. *Id.* The standard is objective: would a reasonable person, innocent of any crime, believe he was being restrained. *Id.* at 372–73, 378 A.2d at 839–40; *see also Commonwealth v. Williams,* 287 Pa.Super. 19, 429 A.2d 698 (1981). In *Commonwealth v. Barnett,* 484 Pa. 211, 398 A.2d 1019 (1979), the court distinguished between approaching a suspect, which is not a seizure, and attempting to stop him, which is. The court held that when the officers pursued a fleeing suspect, they coerced the abandonment of the contraband. *Id.* at 215–16, 398 A.2d at 1021.

Each of the Pennsylvania cases in the *Jeffries* line, which Carroll argues establishes a greater and distinguishable protection under the Pennsylvania constitution, defines the right protected in terms of the Fourth Amendment. The holding in *Jeffries,* for instance, is that "it is clear the police had no right to 'arrest' or 'seize' Jeffries and the action of the police in chasing him and subsequently arresting him a was violation of his Fourth Amendment right." *Id.* 454 Pa. at 325–26, 311 A.2d at 917. Likewise in *Jones,* "the initial confrontation of Jones ... constituted a seizure within the purview of the fourth amendment." 474 Pa. at 374, 378 A.2d at 840. Consequently, while Pennsylvania has read *Mapp v. Ohio* as commanding that the states establish their own definitions of what is a reasonable and what is an unreasonable search or seizure, *Bosurgi, supra,* Pennsylvania has relied on the jurisprudence of the Fourth Amendment to inform the state's definition of seizure. *Jeffries, supra; Jones, supra.* As a result, Pennsylvania jurisprudence of search and seizure closely parallels that of the Fourth Amendment. *Hodari D.* may represent a departure from traditional Fourth Amendment jurisprudence, as Justice Stevens characterized it in his dissent to *Hodari D.* and Judge Ford Elliott characterized it in her dissent to

*Peterfield, supra,* but there is nothing in Pennsylvania law which prevents us from following its logic.

The fourth prong of the *Edmunds* test to determine if we should find greater protections for the individual under Pennsylvania's constitution than those afforded under the U.S. Constitution requires that we look at the jurisprudence of the question in other states. Twenty-three states have found the reasoning of *Hodari D.* applicable.[3] Five states have found

3. *See Finch v. Arkansas,* 1992 WL 383701, 1992 Ark.App. Lexis 783 (cocaine discarded by fleeing suspect abandoned not seized, relying on *Hodari D.*); *California v. Johnson,* 231 Cal.App.3d 1, 282 Cal.Rptr. 114 (1991) (a person reasonably believing he is not free to leave is nevertheless not detained for Fourth Amendment purposes until he either submits to that show of authority or is physically seized by the officer, relying on *Hodari D.*); *Allison v. U.S.,* 623 A.2d 590 (D.C. Court of Appeals, 1993) (suspect not seized until after he threw away a gun, the gun was therefore abandoned property and should not be suppressed, relying on *Hodari D.*); *Robertson v. Delaware,* 596 A.2d 1345 (Del.1991) (definition of seizure from *Hodari D.*); *Florida v. Jenkins,* 616 So.2d 173 (Fla.App.1993) (arrest requires either physical force or submission to the assertion of authority, relying on *Hodari D.*); *Hunt v. Georgia,* 205 Ga.App. 344, 422 S.E.2d 75 (1992) (suspect in fleeing car who discarded cocaine had not submitted to a show of authority, relying on *Hodari D.*); *Idaho v. Rawlings,* 121 Idaho 930, 829 P.2d 520 (1992) (suspect seized within the meaning of the Fourth Amendment when he submitted to an officer's authority, citing *Hodari D.*); *Illinois v. Ramirez,* 244 Ill.App.3d 136, 184 Ill.Dec. 524, 613 N.E.2d 1116 (1993) (applying the rationale of *Hodari D.,* court found no Fourth Amendment violation); *Williams v. Indiana,* 611 N.E.2d 649 (Ind.App.1993) (if a reasonable person would feel free to go, fourth amendment protections are not triggered, citing *Hodari D.*); *Iowa v. Johnson–Hugi,* 484 N.W.2d 599 (Iowa 1992) (principles of *Hodari D.* applied to case); *Louisiana v. Harris,* 613 So.2d 807 (La.App.1993) (*Hodari D.* controlling, but strong dissent argues that state supreme court has not adopted *Hodari D.* and that state law would afford greater protection); *Henderson v. Maryland,* 89 Md.App. 19, 597 A.2d 486 (1991) ("we hold that Article 26 of the Md. Declaration of Rights does not afford appellant any greater protection than that of the Fourth Amendment to the United States Constitution," adopting *Hodari D.*); *Massachusetts v. Laureano,* 411 Mass. 708, 584 N.E.2d 1132 (1992) (specifically did not reach the question of whether the state constitution afforded greater protection than does the Fourth Amendment after *Hodari D.*); *Michigan v. Hawkins,* 439 Mich. 933, 479 N.W.2d 705 (1992) (defendant abandoned drugs before he was seized, following *Hodari D.*); *In the matter of the Welfare of E.D.J.,* 492 N.W.2d 829 (Minn.App.1992) (no historical basis to depart from *Hodari D.*); *Missouri v. Nicholson,* 839 S.W.2d 593 (Mo.App.1992) (arrest defined as physical restraint or submission assertion of authority, relying on *Hodari D.*); *Nebraska v. Van Ackeren,* 242 Neb. 479, 495

that their constitutions afford greater protection than does the Fourth Amendment following *Hodari D.*[4]

The final prong of the *Edmunds* test is public policy. Two public policy considerations guide our thinking: the first and most fundamental is the right of a citizen to be free of unwarranted privacy invasions by the police. The second and less compelling argument, although it is one advanced in *Hodari D.*, is the public benefit in curtailing the number of police chases.

A violation of the constitutional right to be free from unreasonable searches and seizures occurs at the moment of search, not at the moment that any contraband found in an unreasonable search is admitted at trial. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Mapp, supra; Bosurgi, supra.* Therefore, public policy demands that our rule of law be designed to reduce the number

N.W.2d 630 (1993) (suspect is not seized when an officer with a drawn gun tells him to freeze and the suspect runs, relying on *Hodari D.);* *New Mexico v. Esguerra,* 113 N.M. 310, 825 P.2d 243 (App.1991) (fleeing suspect is not seized, relying on *Hodari D.); North Carolina v. McDaniels,* 103 N.C.App. 175, 405 S.E.2d 358 (1991) (seizure definition from *Hodari D.); North Dakota v. Ritter,* 472 N.W.2d 444 (North Dakota 1991) (principles of *Hodari D.* guide analysis); *Ohio v. Barnwell,* 1993 WL 135796, 1993 Ohio App. Lexis 2293 (Ohio App., April 29, 1993) (suspect voluntarily discarded contraband in a case governed by *Hodari D.); Texas v. Rose,* 844 S.W.2d 911 (Tex.App.1992) (holding of *Hodari D.* governs under both state and federal constitutions); *Utah v. Higgins,* 837 P.2d 9 (Utah App.1992) (seizure defined in *Hodari D.); Vermont v. Sutphin,* 614 A.2d 792 (Vermont 1992) (seizure from *Hodari D.); Woodson v. Virginia,* 245 Va. 401, 429 S.E.2d 27 (1993) (suspect arming himself in response to a police approach is similar to flight in that there is no submission to an assertion of authority, relying on *Hodari D.).*

4. In *Hawaii v. Quino,* 74 Haw. 161, 840 P.2d 358 (1992), the state's supreme court held "we decline to adopt the definition of seizure employed ... in *Hodari D.* and, instead, choose to afford greater protection to our citizens by maintaining the *Mendenhall* standard." Connecticut, too, remained with the *Mendenhall* standard in *Connecticut v. Oquendo,* 223 Conn. 635, 613 A.2d 1300 (1992), holding that a person is seized for state constitutional purposes under circumstances in which a reasonable person would not feel free to leave. Oregon adopted a similar standard under its constitution, that a person is seized when he or she has an objectively reasonable belief that he or she is not free to leave. *Oregon v. Holmes,* 311 Or. 400, 813 P.2d 28 (1991). And, New Jersey held that pursuit is seizure in *New Jersey v. Doss,* 254 N.J.Super. 122, 603 A.2d 102 (App.1992), under state law.

of impermissible searches; suppression of the "fruit of the poisonous tree" is a remedy, not an end in itself. *Mapp, supra; Commonwealth v. Rodriguez,* 532 Pa. 62, 614 A.2d 1378 (1992). If we are to reduce the number of impermissible searches, we can best accomplish that by giving police and citizens alike clear guidance to govern their interactions. *Chesternut, supra.* And, we must reserve to the citizen the control over any encounter with authority which is not based on probable cause or reasonable suspicion. *Commonwealth v. Metz,* 412 Pa.Super. 100, 117–118, 602 A.2d 1328, 1337 (1991), *appeal granted,* 531 Pa. 652, 613 A.2d 558 (1992), (Kelly, J., concurring).

■ If a police officer approaches a citizen without probable cause to arrest, *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987), or reasonable suspicion to detain and interrogate, *Terry v. Ohio, supra; Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969), then that citizen is not seized unless he or she is physically restrained or submits to the assertion of authority. *Hodari D., supra.* A citizen may demonstrate his or her objectively reasonable belief that he is free to leave, *Mendenhall, supra,* by leaving, as did both Hodari D. and, in the case at hand, Carroll. Flight alone cannot create either probable cause to arrest nor reasonable suspicion to detain. *In the Interest of Barry W.,* 423 Pa.Super. 549, 621 A.2d 669 (1993). Under the reasoning of *Hodari D.,* it is only the actions of the citizen, the act of discarding contraband or exposing it to view, not the action of the police officer in pursuit, which can give rise to probable cause or reasonable suspicion. Carroll always had his own legal protections in his own hands, and so long as he carefully exercised his right to privacy, that is did not throw away or drop contraband within sight of a police officer, he would not have created the probable cause necessary to justify his arrest.

■ When we follow the reasoning of *Hodari D.,* we have not changed the equation of police/citizen encounters, we have only made clearer the standard by which we evaluate the permissibility of the police intrusion. Not every encounter

between police and the citizenry is a seizure. *Terry, supra.*
Police may approach a citizen to give or get information.
*Mendenhall, supra,* 446 U.S. at 553, 100 S.Ct. at 1876. If the
citizen chooses to end or avoid an encounter with a police
officer, he is free to do so. *See Metz, supra* ("[t]he free citizen
in a free country such as ours of course retains the discretion
to run, walk, crawl or stop at that moment . . .") (Kelly, J.,
concurring). If the officer chooses to pursue the retreating or
fleeing suspect, in a slowly moving car, *Jeffries, supra,* by
chasing, *Jones, supra,* or as here, chasing with a hand on a
holstered gun, the action of the officer cannot transform the
encounter from one without probable cause or reasonable
suspicion to one with probable cause or reasonable suspicion.
Only the actions of the citizen can change the nature of the
encounter, or, more accurately, create a new encounter. The
choice to provide probable cause for an arrest or reasonable
suspicion for a detention lies with the citizen, not with the
officer. Only when a citizen exposes contraband to the offi-
cer's view will the nature of the encounter between the two
change. If the citizen provides an officer with probable cause
or reasonable suspicion, then seizure is reasonable. There-
fore, control over the fundamental right to be secure in our
persons resides where it constitutionally belongs, in the hands
of the citizen.

Following the reasoning of *Hodari D.* should result in fewer
rather than more police chases of otherwise not suspected
citizens. Since flight alone cannot create reasonable suspicion
or probable cause, *Barry W., supra,* only the additional actions
of a citizen, i.e., dropping contraband in front of an officer, can
create the requisite probable cause or reasonable suspicion for
seizure. This is a clearer and brighter line than is the
jurisprudence of coerced abandonment because the nature of
an encounter between a police officer and a citizen is mea-
sured at the time of the approach. Under *Hodari D.* a police
officer no longer has to make a curbside evaluation of just how
far he can go without creating coerced abandonment. Both
the officer and citizen now know that only the citizen can
create probable cause or reasonable suspicion by abandoning

contraband and that the police officer no longer has a grey area of conduct before his pursuit becomes a seizure. Under *Hodari D.*, seizure is either physical restraint or the submission to the assertion of authority. If a citizen exercises his right to end an encounter with a police officer, he is free to do so and remains free to do so unless he, the citizen, gives the officer probable cause or reasonable suspicion to arrest him. Flight alone does not do that. *Barry W., supra.*

Using the concept of coerced abandonment to describe a situation of quasi-seizure is a slippery slope on which neither the police officer nor the citizen has clear guidance. What is coercion? Following in the car? Chasing at a walk? Chasing at a run? Chasing with a hand on a holstered gun? The gradation of possibility between an officer and a retreating citizen left an officer unclear at what time his or her actions crossed the line from approach to pursuit. Following the reasoning of *Hodari D.* removes that calculation from the equation which delineates permissible from impermissible police contacts. An officer may approach a citizen, may question a citizen, may even detain a citizen, but an officer may not search or seize a citizen unless he or she has probable cause or reasonable suspicion. *Terry, supra.* Thus, an officer will know at all times during an interaction with a citizen whether he or she has the right to seize that citizen. The answer will always be no unless the officer has probable cause or reasonable suspicion.

Contrary to Carroll's argument and that of the dissent in *Hodari D.*, the holding of *Hodari D.* does not shield a wide range of police conduct from constitutional scrutiny. Indeed, *Hodari D.* places greater emphasis on the constitutional permissibility of the original encounter by returning to the citizen the control over his own constitutional rights. A citizen approached by a police officer who is *arguendo* without probable cause or reasonable suspicion may choose to converse with, comply with and submit to all that the police officer asks. Any search which ensues is an impermissible invasion of Fourth Amendment expectations of privacy and any fruit of the poisonous tree will be suppressed as such because we have

a show of authority and submission as required by *Hodari D.* If the citizen chooses to end the encounter with the police officer, he or she is free to go without arousing reasonable suspicion or probable cause. *Barry W.* And, he or she may go in any fashion which suits him or her, walking, running, crawling. Whether or not the police officer follows, the encounter will not be infused with probable cause or reasonable suspicion unless the citizen chooses to so infuse it. When and only when the citizen exposes something private, i.e. contraband, to the view of the officer would the nature of the encounter change. At all times, the citizen has the control over the encounter; this is all the state and federal constitutions demand. *Katz, supra; Rodriguez, supra.* All of the choices are those of the citizen and all of the control lies in the hands of the citizen.

Thus, when we examine the source of Pennsylvania's law of search and seizure as we must under *Edmunds, supra,* to decide whether to follow state or federal precedent regarding the moment at which seizure occurs, we find that the history of the state jurisprudence is couched in terms of the federal decisions, *Jeffries, supra; Jones, supra; Barnett, supra.* Only five states have found greater protections in their state constitutions than that afforded by the Fourth Amendment after *Hodari D.* and twenty-three states have not distinguished their constitutional protections from those afforded by the Fourth Amendment after *Hodari D.* And, finally, the public policy considerations of preventing unreasonable searches and seizures and limiting police chases, are better served by a bright line test in which the citizen controls the nature of an encounter with the police. Nor is there any overriding state public policy command which would justify a departure from federal jurisprudence.

Therefore, when we apply the reasoning of *Hodari D.* to the case at hand, we find that when the officer approached Carroll there was no seizure because Carroll was neither physically restrained nor did he submit to the officer's assertion of authority. When the pursuing officer saw the dropped or discarded drugs, he then had the requisite probable cause to

arrest and search Carroll. Since neither the officer's approach to or pursuit of Carroll was a seizure, the cocaine packets dropped in the alley are not "fruit of the poisonous tree" and should not have been suppressed.

Order reversed.

WIEAND, TAMILIA and HUDOCK, JJ., join.

CAVANAUGH, J., files a CONCURRING OPINION, in which TAMILIA and HUDOCK, JJ., join.

JOHNSON, J., files a DISSENTING OPINION, in which McEWEN, DEL SOLE and BECK, JJ., join.

CAVANAUGH, Judge, concurring.

I JOIN the Majority Opinion, and would add the following comments.

## I.

I believe that both the Majority Opinion and the Dissenting Opinion fail to address an important aspect of the present issue. Our Supreme Court has declared that "[w]hile we can interpret our own constitution to afford defendants greater protections than the federal constitution does ... there should be a *compelling* reason to do so." *Commonwealth v. Gray*, 509 Pa. 476, 484–5, 503 A.2d 921, 926 (1985) (emphasis added); *accord Commonwealth v. Sell*, 504 Pa. 46, 63–4, 470 A.2d 457, 467 (1983) (Hutchinson, J., dissenting). Thus, while certainly our Constitution may afford greater protections than the U.S. Constitution, *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), I would submit that a party bears a heavy burden of persuasion in convincing a court that our Commonwealth's Constitution differs from the Federal Constitution.

We are not interpreting Constitutions from two alien societies: the intellectual climate when the Pennsylvania Constitution was written is substantially similar to that when the United States Constitution was written. The provisions in our Commonwealth's Constitution are often either identical or very similar to that which appears in our national Constitu-

tion.  To rule without compelling reason that the two Constitutions differ erodes public confidence in the Rule of Law.  *Cf. Sell, supra,* 504 Pa. at 70, 470 A.2d at 470 (Hutchinson, J., dissenting) ("I believe the interest of this nation are best served by maintaining common standards of constitutional law throughout its separate jurisdictions.")  It is precisely for this reason why the Supreme Court set forth four considerations in *Edmunds, supra,* to assist a court in analyzing whether a provision in Pennsylvania's Constitution is more expansive than its federal counterpart.  *Edmunds, supra,* 526 Pa. at 390, 586 A.2d at 895.  For the reasons eloquently stated in the Majority Opinion, it is apparent that there is no "compelling reason" to interpret our Commonwealth's Constitution in this instance more broadly than the Federal Constitution.

## II.

The Dissenting Opinion characterizes as "thorough and well-reasoned" the dissent in *Commonwealth v. Peterfield,* 415 Pa.Super. 313, 609 A.2d 540 (1992), *app. den.,* 421 Pa. 215, 618 A.2d 400 (1992).  I would agree, for the most part, that the dissent is a superb expression of the opposing viewpoint to that articulated by the majority herein.  However, I wish to point out that the dissent in that case erred in one major respect: the dissent inaccurately claimed that where a constitutional right is interpreted to be less expansive than formerly, an intermediate appellate court must await the Pennsylvania Supreme Court's ratification of the change and must automatically assume that our Commonwealth's Constitution affords the more expansive interpretation.  As the *Peterfield* dissent's legal theory has entered into our deliberations of this case, and acceptance of this theory could have a profound effect on our ability to review claims under the Pennsylvania Constitution, I think it worthwhile to pause to discuss the *Peterfield* dissent's theory.

My research indicates that this legal theory has not been articulated by any other court of law.  It derives solely from the dissent in *Peterfield,* wherein the dissent (mis)quoted a

18

weekly legal newspaper for this proposition. The relevant passage in the dissent reads as follows:

> Echoing the majority's concern for our proper role as an intermediate court, I would propose that "until a change in federal constitutional requirements is ratified by the Pennsylvania Supreme Court, a lower Pennsylvania court *must* treat an analogous state constitutional claim as a matter of independent constitutional interpretation, no matter how closely federal authority has been followed in the past."

*Peterfield, supra,* 415 Pa.Super. at 336, 609 A.2d at 552 (Ford–Elliott, J., dissenting), *quoting* B. Ledewitz, "The State Constitution Assumes New Importance," *Pennsylvania Law Journal Reporter,* Vol. 7, No. 42 (November 5, 1984) at 1, 10 (emphasis added). The original newspaper article quote was identical to the above except it averred that a "... a lower Pennsylvania court *may* treat an analogous state constitutional claim as a matter of independent constitutional interpretation...." *Ledewitz, supra,* at 10. The thrust of the passage which is misquoted in the *Peterfield* dissent thus stands for nearly the opposite proposition: an intermediate appellate court may consider, and presumably reject, independent state grounds as a basis for disposition where there has been a change in federal constitutional law.

Thus, it appears that a misquote from a weekly legal newspaper was given credence as a doctrine of law in a Superior Court panel dissent. Only the most severe of repercussions could result from following this error in the future. Federal Constitutional law is not static: it is announced, refined and changed by various federal courts in an ongoing process. The implication of the *Peterfield* dissent is that we must adhere to the high-water mark of expansive federal constitutional interpretation until the Pennsylvania Supreme Court says otherwise. However, determining the high-water mark is a feat in itself. Not all courts or commentators can agree what the federal constitutional law is presently or was at certain point, let alone what it should be in the future. Trying to figure out what the law was at a certain point will be judicially unmanageable and waste the resources of both prac-

titioner and judge alike. Constitutional tides come in and they go out. I believe the only relevant inquiry is where the tide is now, not its ebb and flow.

The dissent in *Peterfield* assumes that the high-water mark of constitutional jurisprudence is normative, such that we should presume that the Supreme Court would disfavor a more restrained approach. Such an assumption is unwarranted. There is no reason to think that the Pennsylvania Supreme Court would not follow federal law in interpreting our state constitution in any a particular instance. *See Gray, supra,* 509 Pa. at 485, 503 A.2d at 926 (1985) (Pennsylvania Supreme Court fails to find persuasive that *Aguilar–Spinelli* test for probable cause applies under the Pennsylvania Constitution rather than the more recent federal test articulated in *Illinois v. Gates* ). Moreover, and in any event, there exists no articulable reason why, without guidance from our Supreme Court, we should voluntarily limit our ability to review (and reject) claims under the Pennsylvania Constitution.[1] I would trust in the institutional capacity of this intermediate court to correctly interpret a claim under the Pennsylvania Constitution. In conclusion, I feel it is of the utmost importance that we nip at the bud this novel legal theory of dubious origins before it takes on a life of its own.

## III.

The final consideration that *Edmunds, supra,* mandates is public policy. I would like to propose an additional reason to believe public policy is best served by following *Hodari:* the investigatory function of the police is severely handicapped by a the fungible definition of "seizure" articulated in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). As the Majority Opinion notes, the *Mendenhall* test is as follows: "[a] person has been seized within the meaning of the Fourth Amendment only if, in view of all the

1. I would presume, given that the Supreme Court carefully set forth a mode of analyzing state Constitutional claims in *Edmunds, supra,* that the Court has attempted to facilitate, not discourage, lower courts' analysis of claims under the Pennsylvania Constitution.

circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." As the Majority Opinion notes, what is reasonable is subject to differing interpretations. Under that test, the mere articulation by a police officer of the word "stop" has been considered akin to a seizure. *See In the Interest of Barry Williams,* (No. 2961 Phila.1990, filed April 9, 1992) (Cavanaugh, J., dissenting).* This cannot be.

The tenor of the Dissenting Opinion posits that flight is a reasonable reaction to police presence. I disagree, and see no constitutional reason why the police should be discouraged from following a person who may have or currently may be engaging in criminal activity. The plain fact is that those who flee the police often have something to hide. In the present case, the fleeing appellee possessed 47 packets of crack cocaine. In the three companion cases which follow, the persons fleeing the police were attempting to hide either drugs or unlawfully-carried weapons secreted on their person. Although the case is obviously not before us today, one could imagine a scenario where the police are prevented from following someone fleeing their presence who later turns out to be a violent felon. I believe experience shows that when a person flees at the sight of the police, it is frequently to prevent the detection of criminal activity. "The wicked flee when no man pursueth." Proverbs 28:1, *as quoted* in *Hodari, supra,* 499 U.S. at ——— n. 1, 111 S.Ct. at 1549 n. 1, 113 L.Ed.2d at 695–6 n. 1.

I would compare this to the danger the Dissenting Opinion claims is presented by the *Hodari* definition of seizure. The Dissenting Opinion cites Justice Stevens' dissent in *Hodari* for the worry that the *Hodari* definition of seizure encourages the police to use a "slow chase" as an evidence-gathering technique. See Dissenting Opinion at 417. This concern is rather hypothetical, as it would be certainly very difficult for a "chase" to be made "slowly." In any event, this potential concern pales in comparison to the very real threat mentioned

* Opinion withdrawn. Case later heard and decided en banc. *See In the Interest of Barry Williams,* 423 Pa.Super. 549, 621 A.2d 669 (1993).

above that persons who flee the police are concealing criminal activity.

Our police departments are more than just entities that keep statistics of victimization after the fact. They take an active role, consistent with the constitution, in *investigating possible criminal activity*. Fleeing the police at their very sight is not constitutionally protected, nor should it be. While a civilized society should not tolerate police misconduct by any means, a civilized society also should not be so wary of police misconduct that it encourages flight from legitimate law enforcement authorities, a type of lawlessness that contradicts fundamental notions of what is a civilized society.

TAMILIA and HUDOCK, JJ., join.

JOHNSON, Judge, dissenting.

In the present case, we are requested to determine a single issue of law: whether this Court will follow the United State's Supreme Court's decision in *California v. Hodari D.*, 499 U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), in deciding whether a person who abandons contraband while being chased by police was "seized" and thus entitled to invoke the protection of Article 1, Section 8, of the Pennsylvania Constitution to suppress the contraband. Because I understand the holding in *Hodari D.* to be contrary to settled Pennsylvania precedent regarding seizures of persons and the doctrine of coerced abandonment, I must dissent.

Our supreme court defined the standard under which we are to review an appeal from the grant of a motion to suppress in *Commonwealth v. DeWitt*, 530 Pa. 299, 301, 608 A.2d 1030, 1031 (1992) (citations omitted):

We begin by noting that where a motion to suppress has been filed, the burden is on the Commonwealth to establish that the challenged evidence is admissible. In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the

suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.

The facts of this case, when viewed in light of the above standard, reveal that on October 22, 1989, uniformed police officers Joseph Milligan and John Reinecker were on patrol in a marked police car when they observed Richard Carroll and another individual standing on the corner of Olive Street in Philadelphia. Officer Reinecker stated to Officer Milligan, without reason, that he wanted to investigate the individual standing with Carroll. Both officers exited the vehicle and approached the two men. While Officer Reinecker was speaking to Carroll's companion, Officer Milligan approached Carroll with his hand on his gun and started to tell him to remove his hands from his pockets. Before the officer could finish his statement, Carroll turned and fled down an alley. Officer Milligan pursued Carroll, who then slipped and fell. During his fall, two brown-tinted heat-sealed packages containing a white substance dropped from Carroll's pocket. Upon reaching Carroll, Officer Milligan drew his gun and instructed Carroll to remain face down on the ground, with his hands behind his back. Carroll was then handcuffed, arrested and searched. The search of Carroll's pocket revealed 45 additional brown-tinted packets containing a white substance.

Following his arrest, Carroll litigated a motion to suppress the material seized by the police, claiming that the packets were dropped as the result of an illegal stop and seizure by Officer Milligan. The trial court, following a full hearing, granted Carroll's Motion to Suppress, finding that Carroll's loss of the packets from his pockets was the product of the coercive acts on the part of the police, who had neither reasonable suspicion nor probable cause to stop Carroll. The Commonwealth appealed to this Court, which certified this case for *en banc* review.

The Commonwealth contends, and the Majority holds, that we must follow the recent decision of the United States Supreme Court in *California v. Hodari, D., supra,* in the

present case to conclude that there was no seizure of Carroll under either the Fourth Amendment of the United States Constitution or under Article 1, Section 8, of the Pennsylvania Constitution, and therefore, no constitutional principle supports suppression. In *Hodari D.,* the police, without probable cause or reasonable suspicion, approached a group of youths who immediately fled. One of the youths was Hodari D., who upon close pursuit by one of the police officers, discarded what appeared to be a rock but was later discovered to be crack cocaine. Hodari D. was then arrested. Hodari D. moved to suppress the crack as the product of his illegal seizure by police. The trial court denied the petition but the California Court of Appeals reversed, holding that the police seizure of Hodari D. was unreasonable and requiring that the crack be suppressed. The California Supreme Court denied appellate review. The United States Supreme Court granted *certiorari,* reversed the California Court of Appeals and held that Hodari D. was not seized within the meaning of the Fourth Amendment and therefore, the cocaine was not a product of an illegal seizure subject to suppression.

In *Hodari D.,* Justice Scalia speaking for the Court, conceded that the police officers had neither probable cause nor reasonable suspicion to stop Hodari D. The Court concluded, however, relying on archaic common-law theories of arrest and the dictionary definition of seizure, that where an individual does not yield to a show of police authority, that person is not seized and therefore Fourth Amendment guarantees are simply not implicated in such an interaction. The Court in *Hodari D.,* specifically rejected the long-held legal definition of seizure that, "[o]nly when the officer, by means of physical force or show of authority has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). The Court also redefined the test for seizure as articulated in *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980) which stated: "that a person is 'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained."

The *Mendenhall* Court stated that the test for courts to apply to determine whether a seizure had occurred was whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. The Court in *Mendenhall* then gave examples of what would constitute a show of authority by the police including, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request would be compelled." *Id.*

In what the *Hodari D.* dissent interpreted as "nothing if not creative lawmaking", (*Hodari D.*, 499 U.S. at ——, 111 S.Ct. at 1559, 113 L.Ed.2d at 707), Justice Scalia interpreted *Mendenhall* to require the police show of force as a "necessary, but not a sufficient condition" for a seizure. *Hodari D.* at ——, 111 S.Ct. at 1551, 113 L.Ed.2d at 698. In order for the seizure to be effectuated under the new *Hodari D.* standard, the police show of force must now be coupled with submission to police authority. *Hodari D.* at ——, 111 S.Ct. at 1552, 113 L.Ed.2d at 699. No longer does the "free to leave" standard apply in determining whether a seizure has occurred. Now, whether a seizure has occurred, absent physical restraint by the police, depends upon the individual's reaction to the show of authority by the police. *Hodari D.* at ——, 111 S.Ct. at 1559, 113 L.Ed.2d at 707 (dissenting opinion by Stevens, J.). The Court reasoned that since despite a show of force by the police, Hodari D. did not submit to police authority, he was not seized. Seizure under the new standard did not occur until Hodari D. was tackled by police officers. Therefore, Hodari D. had voluntarily abandoned the crack cocaine, and as such, the crack was lawfully recovered by police and was properly admissible as evidence.

The facts of *Hodari D.* are similar to the facts of the present case. Here, the police officer approached Carroll with his hand on his gun, using an authoritative tone of voice. Carroll, however, did not submit to the authority of the police

but chose to flee. Under *Hodari D.*, whether the officer had reasonable suspicion or probable cause to stop Carroll or whether a reasonable person would have felt not free to leave the scene must be ignored. In determining whether Carroll was seized, we must now only look to the individual's response to the police show of authority. Where, as here, a person decides to flee and is pursued, no seizure has occurred, regardless of the police show of force. It is only when the police actually physically restrained Carroll, with his face to the ground, at gunpoint, will *Hodari D.* permit a court to find, under the Fourth Amendment, that Carroll was seized.

I will concede, as do all parties to this litigation, that we are bound to apply *Hodari D.* in cases arising solely under the federal constitution. *Commonwealth v. Harper*, 416 Pa.Super. 608, 611 A.2d 1211 (1992). However, I disagree with the Commonwealth's contention that we are bound to apply *Hodari D.* to claims arising under Article 1, Section 8, absent a statement to this effect by our supreme court.

In *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), our supreme court articulated the process through which the courts should consider claims arising under the Pennsylvania Constitution, especially addressing concerns arising under Article 1, Section 8. There, the court stated that when interpreting provisions of the Pennsylvania Constitution, courts of this Commonwealth are not bound by the decisions of the United States Supreme Court which interpret similar provisions of the federal constitution. *Id.* at 388, 586 A.2d at 894. While the federal constitution establishes certain minimum levels applicable to the states, each state has the power to implement broader standards under the provisions of its state constitution. *Id.* at 388, 586 A.2d 894. The court, there, cited to Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489 (1977), stating:

Although we may accord weight to federal decisions where they are found to be logical and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, we are free to reject the conclusions of the United States Supreme Court so long as we

remain faithful to the minimal guarantees established by the United States Constitution.

*Id.* at 389, 586 A.2d at 895.

*Edmunds* requires that four factors be briefed and analyzed by the parties in any case which implicates a provision of the Pennsylvania constitution. *Id.* at 390, 586 A.2d at 895 *citing Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Those factors are:

1. the text of the Pennsylvania constitutional provisions;
2. the history of the provision, including Pennsylvania case law;
3. related case-law from other states; and
4. policy considerations, including issues of state and local concern, and applicability with modern Pennsylvania jurisprudence.

*Id.*

Since both Carroll and the Commonwealth have fully complied with this briefing and analysis requirement under *Edmunds,* this Court has the responsibility to undertake an independent analysis of the question presented under the Pennsylvania Constitution. I will now proceed with that required analysis.

First, the text of Article 1, Section 8 of the Pennsylvania Constitution provides:

Security from Searches and Seizures

Section 8. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

The provisions of the Pennsylvania Constitution, while similar to the federal provisions in the Fourth Amendment, have been interpreted independently by our supreme court to afford greater protection to criminal defendants than those provided under the federal constitution. *See, e.g., Common-*

*wealth v. Edmunds, supra; Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989); *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983); *Commonwealth v. Bussey,* 486 Pa. 221, 404 A.2d 1309 (1979).

Second, the history of the Pennsylvania Constitution provides insight into the independent development of the law regarding search and seizure in this Commonwealth. Article 1, Section 8 predated the drafting of the Fourth Amendment by more than a decade. *Commonwealth v. Sell,* 504 Pa. at 63, 470 A.2d at 466. Our supreme court indicated the significance of this provision of our constitution throughout the history of this Commonwealth in *Sell* when it stated:

> In construing Article 1, Section 8, we find it highly significant that the language employed in that provision does not vary in any significant respect from the words of its counterpart in our first constitution. The test of Article 1, Section 8 thus provides no basis for the conclusion that the philosophy and purpose it embodies today differs from those which first prompted the Commonwealth to guarantee protection from unreasonable government intrusion. Rather, the survival of the language now employed in Article 1, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as a part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

*Commonwealth v. Sell* at 65, 470 A.2d at 457.

In *Edmunds,* the supreme court further clarified that while safeguarding personal privacy is the underlying purpose for the protection of the exclusionary rule afforded to Pennsylvania citizens under Article 1, Section 8, the purpose of the protection of the exclusionary rule afforded under the Fourth Amendment is very different. There, the court indicated that:

> The history of Article 1, Section 8, thus indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment, as articulated

in [*United States v.*] *Leon* [468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)].

The United Stated Supreme Court in *Leon* made clear that, in its view, the *sole purpose* for the exclusionary rule was to deter police misconduct. The *Leon* majority also made clear that, under the Federal Constitution, the exclusionary rule operated as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."

*Edmunds,* 526 Pa. at 394–395, 586 A.2d at 897 (citations omitted) (emphasis in original).

With these historical differences in mind, I now turn to the law of seizure and coerced abandonment as it has evolved in this Commonwealth.

In *Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969), our supreme court first adopted the United States Supreme Court's decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There, the court specifically articulated the reasonable suspicion standard, under which the police may seize an individual without probable cause. In *Hicks,* the court stated that, for such a precautionary seizure and search to be legitimate, there must first exist on the part of the police a reasonable belief that criminal activity is afoot and that the seized person is armed and dangerous. *Id.* 434 Pa. at 158–159, 253 A.2d at 279–280. This test for whether a "*Terry* stop" is legitimate remains the standard in this Commonwealth today and has been specifically adopted under Article 1, Section 8, of the Pennsylvania Constitution in *Commonwealth v. Rodriguez,* 532 Pa. 62, 614 A.2d 1378 (1992).

Our supreme court addressed the issue of coerced abandonment in *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973). The facts of that case, as stated by the *Jeffries* court are:

On the afternoon of November 6, 1970, four police officers in an unmarked police automobile observed Jeffries walking along a public street in Pittsburgh. One officer testified

that when Jeffries saw the officers, he 'quickened his pace.' Upon seeing him do so, the officer left the police vehicle and started to pursue Jeffries, who then began to run. While giving chase, the officer observed Jeffries throw a cigarette package under an automobile parked along the street. Shortly thereafter, the officer overtook Jeffries and directed him to stand against a wall. At that moment the other officers arrived on the scene and they were told by the officer, who apprehended Jeffries, to "hold him one minute." The officer then recovered the cigarette package from underneath the parked vehicle, and it was found to contain several foil-wrapped packages of a substance later determined to be heroin.

*Jeffries* at 322, 311 A.2d at 916.

Jeffries contended that his abandonment of the contraband was the direct result of his illegal seizure by the police. Our supreme court agreed, holding that flight in and of itself does not constitute probable cause for arrest. The court also held that Jeffries' flight did not give officers reasonable suspicion to justify a seizure under *Terry, supra,* stating: "Thus, it is clear the police had no right to 'arrest' or 'seize' Jeffries and the action of the police in chasing him and subsequently arresting him was a violation of his Fourth Amendment right." *Jeffries,* 454 Pa. at 325–326, 311 A.2d at 917.

In *Commonwealth v. Jones,* 474 Pa. 364, 373, 378 A.2d 835, 840 (1977), our supreme court adopted the standard which Pennsylvania courts now apply in determining what amount of force constitutes a "seizure." The court put forth the test for whether an individual was seized as whether "a reasonable [person], innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." *Jones* at 373, 378 A.2d at 840.

The issue of coerced abandonment was again addressed by our supreme court in *Commonwealth v. Barnett,* 484 Pa. 211, 398 A.2d 1019 (1979). There, officers on patrol in an unmarked police car observed Barnett walking down the street with his hands in his pockets. When Barnett noticed the

police officers, he ducked behind a parked car. The officers then stopped the car, whereupon Barnett ran. The officers chased Barnett, who discarded a pistol and ammunition during the pursuit. Barnett was subsequently apprehended, arrested, and charged with various firearms offenses and other crimes. The trial court suppressed the gun and the bullets as products of an unlawful seizure. Our supreme court upheld the suppression order stating:

> Under these circumstances, the suppression court was correct in finding that the officers did more than merely approach appellee for questioning. The police conduct here amounted to a coercive factor which was the main reason that appellee abandoned the weapon.

*Barnett* at 216, 398 A.2d 1019.

The Pennsylvania courts have consistently applied the tests articulated in *Hicks, Jeffries, Jones,* and *Barnett* when determining whether a police show of authority constitutes a seizure, whether the seizure was made with probable cause or reasonable suspicion and whether contraband abandoned while police were approaching or pursuing an individual was the product of an illegal seizure. *See, e.g., Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983); *Commonwealth v. Hall,* 475 Pa. 482, 380 A.2d 1238 (1977); *Commonwealth v. Brown,* 388 Pa.Super. 187, 565 A.2d 177 (1989); *Commonwealth v. Bulling,* 331 Pa.Super. 84, 480 A.2d 254 (1984).

This Court has addressed *Hodari D.* in several cases in which individuals had abandoned contraband during an interaction with the police. In *Commonwealth v. Harper,* 416 Pa.Super. 608, 611 A.2d 1211 (1992), a panel of this Court was presented with the issue of whether a person who discarded items of clothing, in which contraband was found, while being pursued by police was "seized" for purposes of the Fourth Amendment. In *Harper,* we were constrained to follow the dictates of *Hodari D.* for Fourth Amendment purposes and concluded that no seizure had occurred during the police chase of the defendant. In that case, however, no claims were made under the Pennsylvania Constitution.

There, Judge Beck writing for our Court described the reasoning in *Hodari D.* to be a marked departure from the generally recognized principles used by the federal courts to determine whether a "seizure" under the Fourth Amendment has occurred. *Harper,* 416 Pa.Super. at 613, 611 A.2d at 1215–1216. In that case, we specifically examined the *Hodari D.* Court's rejection of the standard for determining whether a seizure has occurred, which was set forth by the United States Supreme Court in *Mendenhall, supra.,* and *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). This is the same standard adopted by our supreme court in *Jones, supra.* In *Harper,* the radical change made by *Hodari D.* in Fourth Amendment jurisprudence was illustrated by citation to a comment in 3 W. LaFave, *Search and Seizure* § 9.2, p. 89–90 (2d ed. 1987, Supp.1992), which states:

> What the Court in *Hodari D.* ought to have recognized is that the "not free to leave" concept of *Mendenhall–Royer* has nothing to do with a particular suspect's choice to flee rather than submit or with his assessment of the probability of successful fight. But instead, as the dissenters lament, the majority "concludes that the timing of the seizure is governed by the citizen's reaction, rather than by the officer's conduct." In this sense as well, *Hodari D.* is inconsistent with established Fourth Amendment jurisprudence, including principles emphasized in the very cases relied upon by the majority.... in *Michigan v. Chesternut,* the Court reiterated that in determining whether a Terry stop has occurred, it is necessary to utilize a standard that "allows police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." Such is certainly not the case in *Hodari D.,* for what would otherwise be a groundless and thus illegal *Terry* seizure becomes conduct totally outside the Fourth Amendment merely because of the suspect's nonsubmission.

*Harper,* 416 Pa.Super. at 618, 611 A.2d at 1216.

In *Commonwealth v. Peterfield,* 415 Pa.Super. 313, 609 A.2d 540 (1992), *appeal denied,* 533 Pa. 609, 618 A.2d 400 (1992), Judge Kelly, without joinder, cited *Hodari D.* to hold that

since Peterfield, the arrestee, did not submit to the police show of force, he could not be considered "seized" for purposes of the Fourth Amendment. *Id.* In that case, Peterfield made a claim that, under Article 1, Section 8, he had been illegally seized when he abandoned the contraband, and that all fruits of that seizure should be suppressed. Judge Kelly, however, refused to consider Peterfield's claim under the Pennsylvania Constitution because he had not complied with the briefing requirements put forth in *Edmunds, supra,* that would enable a court to separately analyze such a claim. *Id.* 415 Pa.Super. at 321, 609 A.2d at 543–544. In *Peterfield,* the second judge concurred in the result only, and the third judge dissented.

In *In the Interest of Barry W,* 423 Pa.Super. 549, 621 A.2d 669 (1993) (*en banc*), this Court again discussed *Hodari D.* and its divergence from established Pennsylvania precedent but found *Hodari D.* to be inapplicable to that case, as the issue before the court was not whether a seizure had occurred but whether flight alone could justify reasonable suspicion by the police to forcibly detain the appellant.

While *Hodari D.* has been discussed in other decisions by this Court, this is the first time the issue of whether *Hodari D.* should be applied in the context of a state constitutional claim has been placed squarely before us. Under the third requirement in *Edmunds,* a court interpreting a provision of the state constitution should inform itself of the decisions in sister states regarding the adoption of a newly promulgated rule under the United States Constitution with regard to similar provisions contained in the state constitutions of those jurisdictions. I will now undertake that inquiry.

There has not been uniform acceptance or rejection of *Hodari D.* in other jurisdictions which have faced the issue of whether *Hodari D.* should become the standard under the constitutions of those states.

In *State v. Doss,* 254 N.J.Super. 122, 603 A.2d 102, *cert. denied,* 130 N.J. 17, 611 A.2d 655 (1992), the New Jersey Superior Court was not faced directly with the issue of

whether *Hodari D.* should be applied under the constitution of that state. However, the court clearly stated that the holding in *Hodari D.,* "that pursuit of a suspect by the police was neither a 'search' nor a 'seizure'" was not a permissible conclusion under New Jersey law, as police may only chase a suspect after they have formed "at least an 'articulable suspicion' that [the suspect] was or had been engaged in the commission of a criminal offense." *Id.* 254 N.J.Super. at 127–128, 603 A.2d at 104–105.

In *People v. Holmes,* 585 N.Y.S.2d 718, 181 A.D.2d 27 (1992), the New York Supreme Court Appellate Division considered whether that state should adopt the holding of *Hodari D.* as applicable to a claim under the New York State Constitution. The facts of *Holmes* are similar to the facts of the present case. There, police officers recognized the appellant as an individual who had previously been arrested on drug charges. The police officers, without reasonable suspicion that the appellant was armed or in the process of committing a crime, called to the appellant and gave chase when the appellant turned and fled. During his flight, Holmes discarded a bag containing narcotics, which was recovered by the police after Holmes' apprehension. Holmes moved to suppress the narcotics as the fruit of an illegal seizure.

In *Holmes,* the court held that *Hodari D.* overruled prior New York cases interpreting the Fourth Amendment. However, the court refused to follow *Hodari D.* under Article 1, Section 12, of the New York State Constitution, which provides protections against unreasonable searches and seizures similar to those provided for in Article 1, Section 8, of the Pennsylvania Constitution. There, the court held that the New York Constitution provides greater protection for the privacy of its citizens against unreasonable seizures than its federal counterpart. *Id.* 585 N.Y.S.2d at 719–720, 181 A.D.2d at 28–32.

Similarly, in *State v. Oquendo,* 223 Conn. 635, 613 A.2d 1300 (1992), the Supreme Court of Connecticut also considered the implications of *Hodari D.* upon a claim made under the section of the Connecticut Constitution protecting against unreason-

able searches and seizures. In that case, a police officer stopped Oquendo and his companion because the officer suspected that they could possibly be involved with neighborhood burglaries since they were wearing coats on a warm night. The police officer summoned Oquendo and requested that he produce the duffle bag he was carrying. At that point, Oquendo fled and the police officer pursued. During the pursuit, Oquendo discarded the duffle bag, containing cocaine, which was recovered by the police. Oquendo was subsequently arrested, and moved for suppression of the contents of the duffle bag, as the products of an illegal seizure.

The Supreme Court of Connecticut held that the provisions of the constitution of that state provided greater protection for the privacy of its citizens than the federal constitution and refused to apply *Hodari D.* to the state constitutional claim. *Oquendo,* 223 Conn. at 652, 613 A.2d at 1310. The court rejected *Hodari D.* as providing too restrictive a definition of seizure that was inconsistent with the previous decisions of that court, despite that fact that the protections under the state constitution had always followed the path dictated by the Fourth Amendment jurisprudence of the United States Supreme Court. *Id.*

The Supreme Court of Hawaii has also had the opportunity to address the issue of whether *Hodari D.* should be followed when a claim arises implicating that state's constitutional protection against unreasonable searches and seizures. *State v. Quino,* 74 Haw. 161, 840 P.2d 358 (1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993). There, the court rejected *Hodari D.* as inconsistent with the previous holdings of that court regarding seizures. The court stated that Hawaii has chosen to afford greater protection to its citizens by rejecting the United States Supreme Court's requirement that physical force or submission to an assertion of authority determines whether a person has been seized. *Id.* 840 P.2d at 359. In rejecting the public policy implications of *Hodari D.,* the court stated:

We cannot allow the police to randomly "encounter" individuals without any objective basis for suspecting them of

misconduct and then place them in a coercive environment in order to develop reasonable suspicion to justify their detention. This investigative technique is based on the proposition that an otherwise innocent person, who comes under police scrutiny for no good reason, is not innocent unless he or she convinces the police that he or she is.

*Id.* at 365.

In *State v. Holmes,* 311 Or. 400, 813 P.2d 28 (1991), the Oregon Supreme Court considered the question of what constitutes a seizure under both the Oregon Constitution and the federal constitution. While the court accepted the holding in *Hodari D.* for the purposes of Fourth Amendment analysis, it defined seizure for the purposes of state constitutional questions much differently than the definition put forth in *Hodari D.* In defining what constitutes a "seizure" under the Oregon Constitution, the court stated:

We hold that a "seizure" of a person occurs under Article 1, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a) above, has occurred and such belief is objectively reasonable in the circumstances.

*Id.* 311 Or. at 409, 813 P.2d at 34. This definition is similar to the standard articulated in *Mendenhall, supra,* and the definition of seizure which has until to the present time been followed under the Pennsylvania Constitution.

I find the reasoning of the New Jersey, New York, Connecticut, Hawaii, and Oregon courts to be both sound and persuasive. In each of these states the courts have chosen to remain with the *Mendenhall* "free to leave" analysis. In each of these states, as in Pennsylvania, analysis under state constitutional provisions relating to search and seizure had previously been co-extensive with the analysis provided by the United States Supreme Court in deciding Fourth Amendment issues relating to seizure and coerced abandonment. However due to the dramatic departure that the *Hodari D.* decision repre-

sents from the well-established meaning of seizure as it has developed, these state courts would not countenance such an infringement upon the privacy of their citizens.

The Commonwealth brief informs us that "other jurisdictions that have considered the *Hodari D.* rule that a suspect who decides to flee has not been 'seized,' have accepted and followed it." Brief for Appellant at 17. It is not until its reply brief that the Commonwealth admits that some other states have rejected *Hodari D.*, contending, without citation, that "[t]he majority of states to consider this issue have found the reasoning of *Hodari D.* to be persuasive." Reply Brief for Appellant at 14.

The Majority cites to the split of authority among our sister states regarding this issue as twenty three states accepting of the reasoning of *Hodari D.* and five states rejecting such reasoning. However, after a thorough review of the cases cited, my research reveals that many of the cited state court decisions apply the rationale of *Hodari D.* only in the context of claims made under the Fourth Amendment to the United States Constitution, rather than claims made specifically under similar provisions of the state constitution. As it is uncontested that the holding of *Hodari D.* must be applied to all claims arising solely under the Fourth Amendment to the United States Constitution, I will address only those decisions from other jurisdictions which have held that *Hodari D.* should become the standard for determining whether a seizure has occurred under a state constitutional analysis.

In *People v. Arangure*, 230 Cal.App.3d 1302, 282 Cal.Rptr. 51 (1991), the California Court of Appeals adopted *Hodari D.* for the analysis of a state constitutional claim regarding seizure and coerced abandonment of contraband. The court, however, prefaced its discussion of state constitutional analysis by stating that courts in California are required to interpret state constitutional claims as controlled by Federal precedent due to the adoption of Proposition 8 in 1982, enacted as Article 1, Section 28 of the California Constitution. Otherwise known as the Truth in Evidence Clause, that section abrogates suppression of evidence seized in violation of the California

Constitution but not the federal constitution. Hence, the court in California was required to accept *Hodari D.* for the purposes of a state constitutional claim.

The Louisiana Courts have apparently split on this issue with the Louisiana Court of Appeals accepting *Hodari D.* for the purposes of state constitutional analysis in *State v. Gainer,* 591 So.2d 1328 (La.Ct.App. 4th Cir.1991) and then rejecting the *Hodari D.* analysis for a similar claim under the state constitution in *State v. Tucker,* 604 So.2d 600 (La.Ct.App. 2d Cir.1992), *appeal granted,* 609 So.2d 212 (La.1992).

In *State v. Shahid,* 813 S.W.2d 38 (Mo.Ct.App.1991), the Missouri Court of Appeals followed *Hodari D.* for purposes of its state constitution but engaged in no separate state constitutional analysis, thus providing little guidance to this court.

The Supreme Court of Idaho in *State v. Rawlings,* 121 Idaho 930, 829 P.2d 520 (1992), cited *Hodari D.* with approval but did not specifically adopt the *Hodari D.* rationale under the Idaho Constitution, as that issue had not been squarely placed before the court.

In *Henderson v. Maryland,* 89 Md.App. 19, 597 A.2d 486 (1991), the Maryland Court of Special Appeals, addressed a claim substantially similar to the claim in the case *sub judice.* There, the court adopted the reasoning of *Hodari D.* for the purposes of the Maryland Constitution, rejecting the appellant's claim that Article 26 of the Maryland Declaration of Rights provided greater protection than does the Fourth Amendment to the United States Constitution. *Id.* 597 A.2d at 488.

In *Welfare of E.D.J.,* 492 N.W.2d 829 (Minn.App.1992), *appeal granted,* (January 15, 1993), the Minnesota Court of Appeals, an intermediate appellate court, also adopted the reasoning of *Hodari D.* in interpreting what constitutes a seizure under the constitution of that state. There, the court held that while "[t]here may be compelling reasons for interpreting Article 1, Section 10, of the Minnesota Constitution differently than the United States Supreme Court has interpreted the Fourth Amendment in *Hodari D.,*" the appellant in

38

*E.D.J.* presented the court with no historical basis or court precedent which would permit the court a departure from the federal standard. *Id.* at 830–831. The court also noted that the Minnesota Supreme Court has neither accepted nor rejected *Hodari D.,* for the purpose of determining whether there has been a seizure for purposes of the Minnesota Constitution.

Similarly, the Courts of Appeals in Ohio and Texas have adopted the standard articulated by *Hodari D.* under the Fourth Amendment for purposes of interpreting similar provisions under the constitutions of those states. *See Ohio v. Barnwell,* 1993 WL 135796 (No. 64297 Ohio App., filed April 29, 1993); *Texas v. Rose,* 844 S.W.2d 911 (Tex.App.1992).

There appears to be no uniform acceptance or rejection of *Hodari D.* among our sister states. However, several other jurisdictions have rejected *Hodari D.* despite the fact that their state constitutional definitions of seizure had previously been coextensive with federal law. This reinforces the principle that Pennsylvania need not adopt *Hodari D.* merely because our supreme court has previously interpreted the term seizure, for purposes of the Pennsylvania Constitution, in a manner consistent with the decisions of the United States Supreme Court. To the contrary, this Court has the obligation, when presented with a claim pursuant to the Pennsylvania Constitution, to independently evaluate whether the protections provided to the citizens of this Commonwealth should exceed those dictated under federal law. *Edmunds, supra.*

The fourth requirement under *Edmunds,* requires that courts discuss the policy considerations involved in accepting federal precedent in the context of a claim made under the Pennsylvania Constitution. First, I view this Court's adoption of *Hodari D.* as a drastic departure from the standard for what determines whether a "seizure" has occurred under the established law of this Commonwealth. *See, e.g., Hicks, supra, Jeffries, supra, Jones, supra. See also Harper, supra.*

Second, *Hodari D.* represents a standard under which police officers are unable to predict whether their actions will

result in a seizure or will be outside the protection of Article 1, Section 8, or the Fourth Amendment entirely since whether or not a seizure occurs under *Hodari D.* depends not upon the actions of the police but upon the reactions of the individual involved. Justice Stevens, in describing the virtues of the *Mendenhall* test and the dangers of the approach now promulgated by the *Hodari D.* majority, cited to 3 W. LaFave, *Search and Seizure* § 9.2 at 61 (2d ed. 1987, Supp.1991):

> The "free to leave" concept, in other words, has nothing to do with a particular suspect's choice to flee rather than submit or with his assessment of the probability of successful flight. Were it otherwise, police would be encouraged to utilize a very threatening but sufficiently slow chase as a evidence-gathering technique whenever they lack even the reasonable suspicion needed for a Terry stop.

*Hodari D.,* 499 U.S. at ——, 111 S.Ct. at 1559, 113 L.Ed.2d at 707 (Stevens, J., dissenting). Under *Hodari D.,* this second scenario put forth hypothetically by LaFave, *supra,* has been sanctioned under federal law. No longer will law enforcement authorities be required to assess the impact of their actions prior to pursuing individuals despite the lack of any reasonable suspicion that those individual may be armed or engaged in criminal activity.

Finally, in Pennsylvania, prior to the majority's adoption of the *Hodari D.* rule, the pedestrian had no obligation to comply with any detention upon merely being viewed by the police. *Commonwealth v. Metz,* 412 Pa.Super. 100, 119, 602 A.2d 1328, 1337 (1992), *appeal denied,* 531 Pa. 652, 613 A.2d 558 (1992) (Kelly, J., concurring). The free citizen in a country such as ours of course retains the discretion to run, walk, crawl or stop at that moment or any other under such circumstances, and accordingly, neither the police nor the courts can draw any adverse inferences from the exercise of any such discretion. *Id.; Commonwealth v. Martinez,* 403 Pa.Super. 125, 128, 588 A.2d 513, 514 (1991), *appeal denied,* 530 Pa. 653, 608 A.2d 29 (1992). However, with this Court's adoption of the *Hodari D.* standard, a citizen can enjoy the rights and protections of the Fourth Amendment and Article 1, Section 8, only

if that citizen immediately complies with any police directive, regardless of whether the police officer is acting without reasonable suspicion. At least one commentator has predicted that in *Hodari D.*, the Supreme Court is on the verge of preventing citizens from walking away from police encounters. Note, *California v. Hodari, D.: The Demise of the Reasonable Person Test in Fourth Amendment Analysis,* 12 N.Ill.L.Rev. 463, 494 (1992).

I am unwilling to participate in adopting *Hodari D.* as the law under the Pennsylvania Constitution. I share the fears of Justices Stevens and Marshall that, "[i]f carried to its logical conclusion, it will encourage unlawful displays of force that will frighten countless innocent citizens into surrendering whatever privacy rights they may still have." *Hodari D.*, 499 U.S. at ——, 111 S.Ct. at 1561, 113 L.Ed.2d at 710 (Stevens, J., dissenting).

After a full review of the four *Edmunds* factors, as well as a full review of *Hodari D.* and previous Pennsylvania and United Stated Supreme Court precedents, I can only conclude that to adopt *Hodari D.* as binding on the rights of the citizens of Pennsylvania under Article 1, Section 8, of our constitution would be to overrule all existing precedent on the law of seizure in Pennsylvania. I, therefore, will not join with the Majority in its decision in this case.

Returning to the present case, I would apply the traditional standard articulated in *Jeffries* and *Jones, supra,* to the actions of the police officer in order to determine whether Carroll was "seized" for purposes of Article 1, Section 8, of the Pennsylvania Constitution. I would conclude that a reasonable person would have believed that he was not free to leave when, after his attempted departure from a police officer, he was pursued. When an individual who exercises his right to walk away from a police show of authority is then pursued, a reasonable person would conclude that he or she was not free to leave. *See Jeffries, supra.*

If Carroll were "seized" at the time he fell and dropped the drugs from his pocket, under our traditional analysis, we

would then inquire whether the police officer was acting with reasonable suspicion or probable cause. In the present case, the Commonwealth has offered no evidence that the officer who approached Carroll with his hand on his gun had a reasonable and articulable belief that Carroll might be armed or that criminal activity might be afoot. Any police detention, in the absence of such an articulable belief, renders the police actions illegal and requires suppression of all evidence which was the product of such a "seizure." *Jeffries, supra.; Martinez, supra.*

As I conclude that the "abandonment" of the contraband by Carroll was the product of illegal police conduct, I would affirm the order of the suppression court. I, therefore, respectfully dissent.

McEWEN, DEL SOLE and BECK, JJ. join.