THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID RAMIREZ, Defendant-Appellant.

First District (6th Division)   No. 1—90—2275

Opinion filed March 12, 1993.—Rehearing denied April 22, 1993.

Sam Adam, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore F. Burtzos, and John R. Roe, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, David Ramirez, was convicted of possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1989, ch. 56½, par. 1402(a)(2)(C)), and was sentenced to a term of 35 years' imprisonment. Defendant appeals, contending that: (1) the police officers approached him without probable cause, and that the package containing cocaine that he dropped as he fled from the police should not have been admitted into evidence; (2) defendant's post-arrest statements were inadmissible because they were made during the course of plea negotiations; (3) the court improperly admitted evidence relating to an anonymous tip that drugs were being sold; (4) the court's refusal to rule on codefendants' motion for a directed verdict until the end of trial deprived defendant of two witnesses in his behalf; (5) defendant's cross-examination of a key witness for the State was unduly restricted; and (6) the court's procedure for permitting the direct examination of codefendants' witnesses for the State to occur in the presence of the jury, but the cross-examination by codefendant's counsel in its absence, denied defendant's right to confrontation and a fair trial.

At the evidentiary hearing on defendant's motion to suppress, defendant testified that on September 22, 1989, he was employed at a car wash located at 3630 West Diversey in Chicago. During the early afternoon hours, defendant received a telephone call from his sister, Carmen Vega, asking him to look for some car keys located inside a desk in the office of the car wash. The car, a red Ford Escort, belonged to defendant's father.

Defendant asked one of the car wash customers, codefendant Luis Rosado, to drive him to his sister's house to deliver the car keys. Rosado, driving a black Toyota, dropped defendant off at the intersection of Lavergne and Fullerton Avenues in Chicago. As defendant crossed the street, a car approached him. Two undercover police officers jumped out of the car, grabbed defendant, and began searching him. The men had no warrant for defendant's arrest.

The officers asked defendant where he was going. He replied that he was delivering the car keys to his sister who lived across the street. Defendant showed the keys to the police officers and told them

that the car belonged to his father. The officers grabbed the keys out of his hand and placed defendant inside the undercover car. They asked defendant where his father's car was located. After defendant pointed to his father's car, the officers searched it and pulled out some boxes. Defendant was unaware of the content of the boxes, as he had not used the car within the past 30 days. The police recovered $50 from defendant, but no narcotics. When defendant arrived in court the following day, he learned that the officers had found drugs in the car. On cross-examination, defendant denied knowing codefendant Melvin Monroig or speaking with him on a mobile telephone on the afternoon of the occurrence. Defendant further testified that he entered Rosado's car inside the car wash after it had been washed. Defendant denied entering the Ford Escort after he got out of Rosado's car or that he took something from it. Defendant also denied getting out of the car and walking down the street carrying a package when the police stopped him, running away from the police, or hiding behind a tree after he got out of Rosado's car.

Officer Eugene Roy testified at the hearing that he saw Monroig on September 22, 1989, and that he effectuated his arrest later that day. Roy indicated that he was working with his partner, Matthew Plonavich, and that at approximately 10 a.m., they received information that drugs were being sold at a car wash located at 3630 West Diversey. Lookouts were staked at the front and rear of the building. Plonavich and Roy instituted a surveillance and saw Monroig talking on a cellular telephone. As Monroig spoke, he looked up and down the street. Defendant approached Monroig, and they had a short conversation. Both men then entered a white Suzuki jeep driven by Monroig. The men drove one-half block to Lawndale, and then south approximately one block. Defendant got out of Monroig's car and entered the passenger side of a black Toyota driven by Rosado. Both cars then proceeded a short distance to the intersection of Fullerton and Lavergne, where Monroig parked his vehicle. The car driven by Rosado continued to the corner of Belden and Lavergne, where defendant exited the automobile. Defendant began walking northbound on the sidewalk on the east side of Lavergne. At one point, defendant stood behind a tree and looked in the direction where Rosado's vehicle had driven off.

Defendant proceeded northbound to the corner of Medill and Lavergne. Plonavich was following defendant, who was not carrying anything at the time he got out of Rosado's car. Defendant then entered an unoccupied Ford Escort. Defendant drove to the corner of Medill and Lavergne, turned left onto Lavergne, and drove one-half

block south, turned left again, and proceeded very slowly eastbound on Belden as both officers followed in their vehicles. After defendant stopped the Ford, he sat in the vehicle and looked in the rear view mirror a number of times. Defendant leaned down toward the passenger seat and emerged from the vehicle carrying a brown paper bag underneath his left arm.

Defendant crossed the street and began walking eastbound on the sidewalk. The officers approached defendant, displayed their stars, and identified themselves as police officers. They also stated words to the effect of "stop, halt, don't go any further [*sic*]." Defendant dropped the brown paper bag he was carrying and began to run. Plonavich chased defendant for approximately 25 feet before he apprehended him. Meanwhile, Roy retrieved the bag which defendant had dropped and examined its contents. Roy found a package wrapped in brownish plastic tape which contained a rock-like substance which appeared to be cocaine.

Defendant indicated his understanding of his *Miranda* rights. He stated that he wished to speak to the officers and told them that the brown package was to to be delivered at the corner of Lavergne and Fullerton to Monroig. Roy seized the Ford Escort and conducted a search of the vehicle. Underneath the right front passenger seat, Roy found another plastic tape-wrapped package similar to the one he had recovered from defendant. Inside the trunk, Roy discovered a cardboard box containing six other similar packages containing bricks of cocaine. Thereafter, Plonavich and Roy decided to drive to Lavergne and Fullerton to see if Monroig and Rosado were waiting. Roy observed Monroig walking towards his vehicle and placed him under arrest. The officers found two cellular telephones underneath the passenger seat of his car. Rosado was observed leaving the area at a low to normal rate of speed. (Rosado was not arrested until October 26, 1989, one month after this incident occurred.) The officers drove defendant to the police station and again apprised him of his *Miranda* rights.

On redirect examination, Roy testified that he did not know the identity of the informant who told him that drugs were being sold, nor had he spoken to him on previous occasions. In sum, the information Roy received about the alleged drug sales was from the informant and his observation that some individuals were standing outside the car wash that might have been involved in narcotics trafficking. Roy had no specific information concerning the vehicles allegedly involved in the drug transactions.

After considering the total evidence in this case, including the informant's telephone call, the surveillance of the car wash and subsequent trailing of defendant, and defendant's conduct in dropping the package and attempting to flee, the judge determined that probable cause existed for his arrest. The judge also concluded that the statements made by defendant occurred after *Miranda* warnings were given. Defendant's motion to quash arrest and suppress statements was denied.

Monroig, Rosado, and defendant were tried simultaneously. Monroig and Rosado requested a bench trial, and defendant chose a jury trial. Officer Roy of the Chicago police department testified that on September 22, 1989, he was assigned to the asset forfeiture unit of the organized crime division, and that he was working with Plonavich. His testimony at trial was substantially the same as he had given at the hearing on the motion to quash arrest and suppress evidence.

At the police station, defendant was advised of his rights. Defendant indicated that he wished to speak with the officers. He told the officers that they did not understand the way the deal was structured; that he was merely a runner; that Rosado was the connection to the source of the drugs; and that he was to deliver the drugs to Monroig. Defendant further stated that Rosado was the biggest dope dealer that he knew in Chicago and that he maintained a number of garages in the area where he kept drugs and money. Prior to this incident, defendant saw a gym bag containing several hundred thousand dollars in Rosado's car. Defendant admitted that he knew that there was a kilo of drugs underneath the passenger seat, but that he was unaware of the packages of drugs in the trunk. Defendant further stated that he believed Rosado had informed the police about his participation in the drug transaction because he was jealous and feared that defendant would take his drug customers away from him.

Defendant further stated that he did not keep drugs at the car wash because he was aware that his property could be seized; however, he used the telephones located in the car wash, and at various times different drug dealers would visit him there. Defendant stated that he had $9,000 in cash at home that he would be willing to post as bond. He also stated that he would be willing to cooperate with the police and help find the locations of the garages where Rosado was hiding guns and money. Defendant indicated that his willingness to cooperate with the police was driven by his fear of incarceration, for as a result of his previous gang affiliations, certain gang members held a grudge against him and had issued a contract for his life.

On cross-examination, Roy testified that he did not know the identity of the person making the anonymous phone call, that the caller refused to meet with him, and that no notes were made of the conversation. Roy did not make a report of the conversation he had with defendant for 34 days after the arrest, and he destroyed the notes he made of that conversation. (Later in the proceedings, Roy stated on redirect examination that he did not make a report of the conversation with defendant for more than a month because he wanted to avoid the possibility of information being passed to Rosado.) Roy told defendant that any cooperation he chose to offer the police would be reported to the State's Attorney's office for consideration, but that he could not make any promises of favorable treatment to him.

At the conclusion of the cross-examination by defendant's attorney, the court excused the jury in order to conduct cross-examination by the codefendants' attorneys at their respective bench trials. Defendant objected, contending that it was basically an unfair procedure to permit the State to present its direct examination of all witnesses in the presence of the jury, but not the cross-examination. Defendant's request that the jury be present for the cross-examination was denied.

During cross-examination, which was conducted outside the presence of the jury, Roy stated that he and two other officers effectuated Rosado's arrest on October 26, 1989. As the officers approached Rosado prior to his arrest, he told them that he knew their identity, and that they had been looking for him; however, he had been lying low.

Plonavich also testified for the State to essentially the same sequence of events as stated by Roy. Over defense objection, Plonavich testified that Roy told him that he received an anonymous telephone call informing him that drugs were being sold at the car wash, that male Hispanics were involved and possibly lookouts.

Cotelia Fulcher, a narcotics analyst with the Chicago police department, testified on behalf of the State that she analyzed the substances recovered by Officers Roy and Plonavich. The substances recovered underneath the passenger seat and in the trunk of the car consisted of approximately 8,000 grams, with a purity of 96.4%.

Kevin Kusiak, keeper of records for Cellular One, also testified for the State. The type of information found in the records consists of the subscriber's telephone number, name, address, billing address and information regarding local and long distance records. Kusiak's testimony concerned a match call register for Monroig which covered the period from August 8 through October 8, 1989; however, the last entry made was on September 22, 1989. Five calls, each lasting approxi-

mately one minute, were made during the early afternoon hours of September 22, 1989. The judge denied defendant's motion to strike Kusiak's testimony on the grounds that it did not pertain to him, and also refused to allow the jury to be present during Kusiak's cross-examination.

Larry Renfro, manager of security for Illinois Bell, also testified for the State. Renfro testified about the information contained in the billing records of Illinois Bell, which included the subscriber's telephone number, name, address, listed and billing address, credit information, and long distance and local call details. He identified the State's exhibit of a multipage document of a bill which included the period between September 19 and October 18, 1989. The subscriber of the bill at issue was identified as Maribell Rosado, and the telephone number was among the calls made by Monroig's mobile telephone during the early afternoon hours of September 22, 1989. The judge also denied defendant's request to strike Renfro's testimony.

Over defense objection, Armando Ramirez of the Chicago police department, organized crime division, testified for the State. Based upon his experience and training, Ramirez estimated the street value of the cocaine seized in this case to be $1,889,203.

At the close of the State's case in chief, the judge denied defendant's motion for a directed verdict. Monroig and Rosado also moved for a directed verdict; however, the judge withheld his ruling as to those defendants. Although defendant requested that the court rule on the codefendants' motion because he "may want to call them as our [sic] witnesses," the judge denied his request.

Carmen Vega, defendant's sister, testified that she called defendant around 12:30 p.m. and asked him to bring the spare car keys to the Ford Escort. She had allowed her boyfriend to use the car the previous evening. On cross-examination, Vega stated that she became aware that her brother had been arrested for having drugs in the car, but that she never informed the police that her former boyfriend had used the car the previous night.

Defendant testified that he is the manager of the car wash located at 3630 West Diversey which is owned by his father. On the afternoon of September 22, 1989, defendant's wife was using his car. In the early afternoon hours, defendant received a telephone call from his sister asking him to bring her an extra set of car keys located in the desk of the office. Defendant asked a customer, whom he knew only on a casual basis as Luis, to drive him to his sister's house. Defendant denied knowing Monroig at that time. Rosado dropped defendant off at the intersection of Lavergne and Fullerton. As previously testified

to in the motion to suppress, two officers apprehended him as he crossed the street and began searching him. After the officers found the car keys, defendant told them they belonged to a Ford Escort owned by his father. The officers placed defendant inside their car, and he pointed to the location of his father's car. The officers searched the car and found the drugs.

Defendant denied ever driving the car on the day of the occurrence, or that he had driven it during the preceding month. Defendant denied telling the officers that he was going to deliver a package to Monroig or that he could not serve time in jail because of his prior gang affiliations. Defendant also denied having any conversation with the police regarding favorable treatment in return for his testimony.

In rebuttal, Claude Page, subpoena coordinator and keeper of records for Ameritech Mobile Phone, testified that one of the mobile telephones recovered from under the passenger seat of Monroig's vehicle was subscribed to by defendant's father.

After the jury retired to deliberate, the court entered directed findings of not guilty for Monroig and Rosado. Defendant was convicted of possession of a controlled substance with intent to deliver.

On appeal, defendant first asserts that when the police officers approached him without probable cause, announced their authority, and directed him to halt, the arrest of defendant was effectuated. The subsequent dropping of the package was not an abandonment. Therefore, the seizure of the bag and inspection of the contents violated defendant's fourth amendment rights.

The State contends that the arrest of defendant did not occur until he was taken into custody by the police, and that his dropping the bag on the ground as he began to flee from the police was an abandonment. As support for its position, the State relies upon *California v. Hodari D.* (1991), 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547, wherein the United States Supreme Court analyzed factual circumstances similar to those presented in this case. In *Hodari*, police officers were on patrol in an unmarked car in a high-crime area when they observed several youths, including defendant, huddled around a car parked at a curb. At the sight of the officers' car, the youths apparently panicked and fled. One of the officers left the car and began pursuing defendant. Once defendant realized that the police officer was in close proximity, he tossed away what appeared to be a small rock, which was later found to be crack cocaine. Immediately thereafter, the officer tackled the defendant and handcuffed him.

In its decision, the Court addressed the narrow question of whether, with respect to a show of authority as with respect to appli-

cation of physical force, a seizure occurs even though the subject does not yield. The Court held that it does not. Even assuming that the officer's pursuit of the accused had not been based on reasonable suspicion, the cocaine discarded by defendant was not the fruit of a "seizure" of his person within the meaning of the fourth amendment. An arrest—the quintessential seizure of the person under the fourth amendment—requires either: (a) the application of physical force with lawful authority, or (b) submission to the assertion of authority. In *Hodari*, the defendant had not been touched by the officer at the time he discarded the cocaine. Assuming, *arguendo,* that the officer's pursuit of the defendant constituted a show of authority enjoining him to halt, he failed to comply with that injunction and therefore was not seized until the officer tackled him. The cocaine abandoned while defendant was running was not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.

■ Application of the rationale employed by the Court in *Hodari* to the present case leads to the conclusion that defendant's fourth amendment rights were not violated, and the bag was properly seized and searched as abandoned property. Officer Roy testified that after defendant emerged from the Ford Escort, he was carrying a brown paper bag underneath his left arm. The officers approached defendant, displayed their police badges, and identified themselves as police officers. They also stated words to the effect of "stop, halt, don't go any further [*sic*]." At that point, defendant dropped the brown paper bag he was carrying and began to run. Plonavich chased defendant for approximately 25 feet before he apprehended him. In the interim, Roy retrieved the bag and examined its contents.

In light of the fact that defendant chose to ignore the officers' command to stop, and that he had not been touched by the officers at the time he discarded the package, we do not find that the arrest occurred when the officers first approached him and ordered him to halt, but rather after he abandoned the package.

Defendant next asserts the court erred by denying his motion to bar statements made by him to the police after he was in custody. He argued that such statements were inadmissible because they were made during the course of plea negotiations; as such, they were barred by Supreme Court Rule 402(f). (134 Ill. 2d R. 402(f).) The court denied defendant's motion, and his subsequent attempt to excise portions of those statements also proved unavailing.

Supreme Court Rule 402(f) (134 Ill. 2d R. 402(f)) provides in relevant part:

"If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding."

It is well established that the purpose of this rule is to encourage plea negotiations by eliminating the risk of having the jury hear statements the defendant made while negotiating his plea. (*People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229; *People v. Burns* (1989), 188 Ill. App. 3d 716, 544 N.E.2d 466; *People v. Tennin* (1984), 123 Ill. App. 3d 894, 463 N.E.2d 202.) However, not every statement making reference to a deal or omission of jail time is necessarily a plea discussion for purposes of this rule. (*People v. Williams* (1987), 151 Ill. App. 3d 1010, 503 N.E.2d 1090; *People v. Austin* (1984), 123 Ill. App. 3d 788, 463 N.E.2d 444; *Tennin*, 123 Ill. App. 3d at 898, 463 N.E.2d at 205.) The test to determine a plea-related statement is: (1) whether the accused exhibited a subjective expectation to negotiate a plea, and (2) whether the expectation was reasonable under the totality of objective circumstances. As expressed by the *Friedman* court:

"Before a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State." *Friedman*, 79 Ill. 2d at 353, 403 N.E.2d at 236.

At trial, Roy testified that while defendant was in custody, he stated that he had $9,000 in cash at home that he would be willing to post as bond; that he would be willing to cooperate with the police and help find the locations of the garages where Rosado was hiding guns and money; and that his willingness to cooperate with the police was fueled by his fear of incarceration because of the vendettas that certain rival gang members held against him. However, in *Tennin*, this court refused to characterize as plea-related the defendant's non-specific statement, "I want to make a deal." The *Tennin* court explained:

"Defendant here has not made manifest any indication to plead guilty or what the terms are under which he would be willing to bargain. We cannot assume that every statement by the defendant to the effect of 'making a deal' is plea-related. There are other possible explanations underlying a motivation to make a 'deal,' such as a defendant negotiating for his release without a cash bond or on a low bond, or the dropping of

charges against him in return for information he might supply."
*Tennin*, 123 Ill. App. 3d at 898, 463 N.E.2d at 205.

■■ In the present case, we concur with the trial judge's assessment that the statements at issue were not plea-related. We first note that defendant never entered a guilty plea, nor does the record indicate that he ever attempted to negotiate a guilty plea. The testimony reveals that no specific commitment or offer was made to defendant; rather, the officers merely told him that any cooperation on his part would be reported to the State's Attorney's office for consideration. It is also significant that throughout the motion to suppress, as well as during trial, defendant denied taking any package from the Ford Escort or that he was even carrying a package when the police stopped him. Defendant further denied at trial telling the officers that he could not serve time in jail because of his prior gang affiliations, or that he had any conversation with the police regarding favorable treatment in return for his testimony. To allow defendant to prevail upon his contention that such statements should be inadmissible because they were made during the course of plea negotiations, in spite of the fact that he denied such a conversation ever occurred at trial, is both inconsistent and illogical.

Defendant next asserts that the court erroneously permitted the State to bring before the jury the hearsay contents of the anonymous tip that drugs were being sold at the car wash. In particular, defendant complains that the testimony of Officers Roy and Plonavich, in which they stated that the drug sales were being conducted by Hispanic males and that lookouts were posted near the building, was inadmissible hearsay. Relatedly, defendant argues that the State's comments during closing arguments regarding the anonymous tip were prejudicial. Defendant refers to the following dialogue which transpired during closing argument:

"Assistant State's Attorney: An anonymous tip, that's how this all started. You heard the evidence of that. Someone, probably someone who lived in the neighborhood, saw what was going on in front of that car wash. Someone saw that people were standing there acting as look-outs in both the front and the back, someone who was too afraid to even give their [sic] name over the phone.

Defense counsel: I object to that.

THE COURT: Overruled. She may argue.

Assistant State's Attorney: Someone who was too afraid to meet with the police to discuss what they [sic] had seen but at

least cared enough to make that phone call to OCD Narcotics that day.

\* \* \*

Assistant State's Attorney: Now we all know what drugs do to people, ladies and gentlemen. We all know how powerless drug addicts are to control their lives. We know how they commit crimes, robberies, burglaries.

Defense counsel: I object to this.

THE COURT: She may argue.

Assistant State's Attorney: Not to mention the killings that go on in drug deals.

Defense counsel: Judge, objection, I move for a mistrial.

THE COURT: Overruled."

The State counters defendant's argument by stating that the evidence relating to an anonymous tip regarding the sale of drugs was properly admitted to explain the investigatory procedures and circumstances leading to defendant's arrest. In *People v. Batinich* (1990), 196 Ill. App. 3d 1078, 554 N.E.2d 613, this court held that testimony by a police officer from an informant that defendant was "a drug dealer out of the northwest" was not objectionable hearsay. This court concluded that such testimony was not offered to prove the truth of the matter asserted. (*People v. McNeal* (1987), 160 Ill. App. 3d 796, 513 N.E.2d 897; *People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293; *People v. Thomas* (1975), 25 Ill. App. 3d 88, 322 N.E.2d 597.) Rather, the testimony was elicited to explain why an undercover operation involving the defendant was set in motion. It is proper for an officer to explain the circumstances of his investigation and testify as to how he came upon the defendant's identity. *Batinich*, 196 Ill. App. 3d 1078, 554 N.E.2d 613, citing *McNeal*, 160 Ill. App. 3d 796, 513 N.E.2d 897; see also *People v. Gully* (1986), 151 Ill. App. 3d 795, 502 N.E.2d 1091.

In *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, our supreme court held that it is permissible for an officer to testify to what he did during the course of an investigatory procedure; however, the introduction of the substance of the conversation is objectionable as hearsay. More recently, in *People v. Johnson* (1990), 202 Ill. App. 3d 417, 559 N.E.2d 1041, this court also held that the testimony of the police officers that other parties had identified the defendant as being involved in a burglary was error despite the State's contention that it explained police procedure.

■ In the present case, we agree with defendant that Officer Roy's and Officer Plonavich's testimony exceeded the boundaries of

merely explaining the reasons why the wheels of the police investigation were set in motion. The officers' testimony included specific details such as the fact that lookouts were placed at the front and rear of the building, and that the drug sales at the car wash were being conducted by Hispanic males. According to *Gacho*, comments such as these describing the substance of the conversation between the anonymous informant and the police officer constitute inadmissible hearsay. Also, the comments made by the State during closing argument again highlighted the anonymous informant's statements that drugs were being sold at the car wash, that lookouts were staked in both entrances to the building, and further speculated that the informant was too afraid to give the police his or her name over the telephone. Indeed, the closing comments made by the State went one step farther and even described the killings that also occur in drug deals.

Nonetheless, an evidentiary error of this nature can be labeled harmless if properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant. (*People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.) We first note that defendant was never specifically identified by the hearsay evidence as the individual who was selling drugs. Most importantly, the evidence against defendant was considerable, in view of the fact that the package which defendant dropped contained one kilo of cocaine and several additional kilos of cocaine were found in his car. Defendant also made statements shortly after his arrest that he was a runner in the drug transaction, and that he was aware that there was a kilo of cocaine underneath the passenger seat. In sum, we find the evidence amassed against defendant was sufficient to sustain his conviction in spite of the improper hearsay statements made concerning the contents of the anonymous informant's telephone call.

Defendant further contends that the court's refusal to enter an order at the close of the State's case in chief directing an acquittal of Rosado and Monroig effectively deprived defendant of calling the codefendants as witnesses, in contravention of his constitutional right to call witnesses in his behalf.

Section 115—4(k) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—4(k)) provides:

> "When, at the close of the State's evidence *or at the close of all of the evidence,* the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant." (Emphasis added.)

■ In *People v. Watkins* (1990), 206 Ill. App. 3d 228, 563 N.E.2d 806, this court determined that section 115—4(k) does not mandate that the trial court make its ruling at the close of the State's evidence. Rather, it is sufficient if the ruling is made at the close of all the evidence. *Watkins*, 206 Ill. App. 3d at 243, 563 N.E.2d at 814.

Defendant did not demonstrate the manner in which he was prejudiced by the judge's reservation on his ruling until the time when jury deliberations were in progress. (*People v. Rascher* (1992), 223 Ill. App. 3d 847, 585 N.E.2d 1153.) Also, defendant failed to state with any specificity the nature of the testimony which may have been presented by Rosado or Monroig. When the judge announced his intention to withhold his ruling until the end of the jury trial, defendant stated only that he "may want to call them as witnesses," but offered no further explanation as to whether such testimony would be exculpatory. We therefore reject defendant's claim that when the judge declined to rule on codefendants' motion for a directed verdict at the close of the State's case in chief, he was deprived of his right to call witnesses on his behalf.

Defendant's next argument posits that the court unduly restricted the cross-examination of Plonavich when defendant asked whether he read the report prepared by Roy on a previous occasion to refresh his memory or in an attempt to conform his testimony to that given by Officer Roy in his motion to suppress.

■ The latitude to be allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Collette* (1991), 217 Ill. App. 3d 465, 577 N.E.2d 550.) Moreover, it is firmly entrenched that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. (*People v. Andrews* (1992), 146 Ill. 2d 413, 588 N.E.2d 1126; *People v. Jackson* (1989), 180 Ill. App. 3d 78, 535 N.E.2d 1086; *Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 502 N.E.2d 315; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §103.7, at 19 (5th ed. 1990).) The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper. (*Jackson*, 180 Ill. App. 3d at 91, 535 N.E.2d at 1094.) The failure to make an adequate offer of proof results in a waiver of the issue on appeal. (*Andrews*, 146 Ill. 2d 413, 588 N.E.2d 1126.) In the present case, we find defendant's failure to submit an offer of proof results in waiver of this issue upon review.

In his final argument, defendant contends that the court's procedure of permitting the direct examination of State's witnesses to occur before the jury, while the cross-examination was conducted outside its presence, denied defendant his right to due process, cross-examination, and a fair trial. At trial, the court ruled that the cross-examination of four of the State's witnesses, including Officer Roy, Kevin Kusiak, Larry Renfro and Officer Ramirez, would be conducted out of the presence of the jury. Defendant maintains that this decision placed him in the precarious position of either not cross-examining a witness who had only peripherally, if at all, damaged the defendant, or else cross-examining the witness, thus creating the inference that the witness' testimony directly applied to defendant.

■ We find defendant's argument without merit. We first note that defendant did not file a motion for severance from the other codefendants prior to trial, and he is merely speculating that a different result would have occurred if the jury had been present for the cross-examination. Most importantly, defendant was not deprived of the opportunity to cross-examine the witnesses. Rather, as the State correctly points out, defense counsel faced the same dilemma confronting each trial attorney on a daily basis: namely, the potential benefit or harm which may be derived by cross-examination of a particular witness. Defendant's attempt to raise a claim of prejudice must be founded on more than mere conjecture. *People v. Velez* (1984), 123 Ill. App. 3d 210, 462 N.E.2d 746.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and GIANNIS, JJ., concur.