NOTICE
This Order was filed under Supreme
Court Rule 23 and is not precedent
except in the limited circumstances
allowed under Rule 23(e)(1).

2023 IL App (4th) 221021-U

NO. 4-22-1021

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 19, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| DEVIN JACOB JOHNSON, | ) | No. 21CF48 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Frank R. Fuhr, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding: (1) the trial evidence was sufficient to prove defendant guilty beyond a reasonable doubt of attempted first degree murder, (2) the trial court's reservation of its ruling on defendant's motion for a directed verdict did not amount to clear or obvious error, and (3) the 50-year sentence of imprisonment imposed by the court was not excessive.

¶ 2   Defendant, Devin Jacob Johnson, appeals his conviction for attempted first degree murder. Defendant argues that: (1) the trial evidence was insufficient to prove him guilty of either attempted first degree murder or aggravated battery with a firearm, (2) he was denied a fair trial when the trial court failed to rule on his motion for a directed verdict at the close of the State's evidence, and (3) his 50-year sentence was excessive. We affirm.

¶ 3                           I. BACKGROUND

¶ 4        Defendant was charged with attempted first degree murder (720 ILCS 5/8-4(a), 8-4(c)(1)(D), 9-l(a)(2) (West 2020)) in that he, with the intent to commit first degree murder, performed a substantial step toward the commission of the offense in that he "pointed a handgun at the head of Kelvin Bell and shot Kelvin Bell in the temple, knowing that such act would create a strong probability of death or great bodily harm to Kelvin Bell, and that in committing said offense, the defendant personally discharged a firearm that proximately caused great bodily harm, permanent disability, or permanent disfigurement to Kelvin Bell." Defendant was also charged with aggravated battery with a firearm (*id.* § 12-3.05(e)(1)) in that, while committing a battery, he personally discharged a handgun, thereby causing great bodily harm to Bell.

¶ 5        The matter proceeded to a jury trial. The evidence at the trial established that Bell sustained a gunshot wound to the right side of his head in the early morning hours of January 24, 2021, while sitting in defendant's vehicle that was parked just outside of defendant's residence. Three individuals who lived near the scene testified they heard a gunshot that morning. One of these individuals stated he was looking at his phone when he heard the gunshot, and he observed it was 1:26 a.m. Data retrieved from Bell's cell phone indicated that the last activity on the phone was at 1:24 a.m. Alisha Johnson, defendant's wife, called 911 at approximately 2 a.m. and reported that Bell had been shot. A recording of the call was admitted into evidence. In the recording, Alisha indicated defendant had just found Bell in defendant's vehicle with a gunshot wound. She stated she was not present during the shooting. She stated that she and defendant left to go to the store, and, when they returned home, they found Bell had been shot.

¶ 6        Police officers responded to the scene shortly after Alisha called 911. Emergency personnel took Bell to the hospital. An emergency room physician who treated Bell that morning testified that Bell sustained a gunshot wound to the right side of his head, which caused bone

fractures and injury to the brain tissue and adjacent structures. Bell's mother testified that Bell was not doing well since the shooting. She stated Bell had only one eye, could not hear, was paralyzed on the left side, had memory loss, and was currently residing in a "caring environment by medical staff."

¶ 7　　　　　Sergeant Kris Kuhlman testified that he arrived at the scene at approximately 2 a.m. on the morning of the incident. He observed Bell sitting in the front passenger seat of a vehicle with a gunshot wound to the right side of his head. Bell was moaning and moving but could not speak. The front passenger door to the vehicle was open and defendant was standing next to Bell and tending to him. Defendant was distraught and emotional. Kuhlman observed what appeared to be a "gunshot hole" in the front passenger window of the vehicle.

¶ 8　　　　　Officer Ibrahim Ramirez testified he also responded to the scene, where he spoke to both defendant and Alisha. Ramirez indicated defendant seemed nervous and was quick to say he was not in the area when the shooting occurred. A recording of Ramirez's body camera footage was admitted into evidence. In the recording, defendant stated Bell was sitting in defendant's car calling people to try to get a ride. Defendant and Alisha left to buy cigarettes, and, when they returned, Bell had been shot. Defendant stated Bell had been drinking that night, and he smoked crack. Defendant was crying at times during the conversation.

¶ 9　　　　　Officer Andrew Lawler testified he also responded to the scene. Lawler located a shell casing on the road approximately three feet in front of the vehicle where Bell had been shot and a "bullet" on the ground just outside the passenger side door. Lawler stated that by "bullet," he meant a "complete round of ammunition that was unfired."

¶ 10　　　　Garrett Alderson, a criminalist who worked for the Rock Island Police Department, testified that he was familiar with the general functioning of handguns. He stated a

semiautomatic handgun has a frame, grip, trigger, and slide. It typically has a magazine that is fed into the bottom of the grip. Alderson stated that a person operating a semiautomatic handgun must "charge" or "rack" the slide to load a cartridge after the magazine has been inserted. Once the slide is racked, the cartridge is chambered. Alderson indicated that if one were to rack the slide when a cartridge was already in the chamber, "that cartridge that's loaded will then kick out and then a new cartridge in the magazine will then feed and then take that previous cartridge's place."

¶ 11 Detective Sean Roman testified he was assigned to investigate Bell's shooting. After officers responded to the scene, defendant and Alisha were brought to the police station to be interviewed. They were considered cooperating witnesses at that point. Roman and Detective Phil Anderson interviewed Alisha first. During the interview, Alisha indicated defendant came home at approximately 1:30 a.m., and they left the residence to purchase cigarettes at the 7-Eleven. Bell was sitting in defendant's white Cadillac in front of the residence when they left. She stated that they returned home approximately 10 minutes later, and defendant observed that Bell had been shot. Roman testified he believed Alisha lied during this interview because officers had obtained surveillance video footage from a camera near the 7-Eleven, which showed a vehicle the detectives believed belonged to Alisha drive past the 7-Eleven at 1:41 a.m. The vehicle reappeared and pulled into the 7-Eleven parking lot approximately eight minutes later. Roman indicated he believed defendant and Alisha had gone somewhere else that she had not disclosed.

¶ 12 Roman stated he interviewed defendant after his initial interview with Alisha, and he then interviewed Alisha a second time. At that point, Alisha was a suspect for obstructing justice and was not free to leave. The detectives then interviewed defendant a second time. At

- 4 -

that point, they were planning to arrest Alisha for obstruction of justice. Alisha agreed to speak to them a third time, and she provided them with a video recording from a camera in her bedroom showing defendant entering the bedroom on the morning of the incident. The detectives ultimately released Alisha without charging her. They then interviewed defendant a third time.

¶ 13 Video and audio recordings of defendant's three interviews were admitted into evidence and played in court. During the first interview, defendant indicated that, on the night before the incident, he and Bell went out and had a few drinks. Defendant dropped Bell off at the end of the night. Bell then called defendant and told him that some individuals who had previously "jumped" him were in Bell's parking lot. Defendant picked up Bell and drove home. Defendant indicated that he was "done" at that point and did not want to drive Bell anywhere else. Bell started calling people to try to get a ride. Defendant and Alisha then went to 7-Eleven to buy cigarettes. When they left, Bell was sitting in defendant's vehicle, looking at his phone. When defendant and Alisha returned home, defendant went to his vehicle to make sure the doors were locked. He saw Bell had been shot and told Alisha to call 911. Defendant initially denied that he and Alisha went anywhere other than 7-Eleven. However, the detectives told defendant they had him on camera driving past the 7-Eleven. Defendant then stated he and Alisha initially drove past the 7-Eleven to go to a different store, but it was closed, so they drove back to the 7-Eleven.

¶ 14 During the second interview, defendant indicated he was actually present in the car when Bell was shot. Defendant saw the shooter run down an alley but he "couldn't get a look at him." After the shooting, defendant and Alisha drove around and discussed how to "keep [defendant] out of the situation" because he was in the car during the shooting. A detective asked defendant if this was more important to him than getting help for Bell, and defendant said he

thought Bell was dead at that time. Defendant acknowledged that Bell was moving later when the officers arrived, but he stated Bell was not moving at all right after the shooting.

¶ 15        During the third interview, defendant gave the detectives yet another version of events, stating he had tried to drop Bell off that morning, but Bell would not get out of the car. Defendant indicated he had been awake for two days, wanted to go to sleep, and did not want to leave Bell in his car. Defendant pointed a gun at Bell to scare him. A detective asked defendant if he then pulled the trigger or "racked" the slide. Defendant stated: "I don't know because—if I pulled it, I thought it was on safety." Defendant stated he was "not in [his] right mind" and it was like he was watching it "outside [his] body." Defendant began to cry and stated he did not think the gun was really going to go off. Defendant stated he would never purposefully have done that to Bell. One of the detectives indicated he believed defendant. Defendant stated he panicked after he shot Bell, and he threw the gun into a river when he was driving around with Alisha after the shooting. During the interview, Roman stated that defendant had "owned up" to his mistakes. During his trial testimony, however, Roman stated he could not recall if he actually believed defendant at that time.

¶ 16        Alisha testified that she was interviewed by the police after the incident, and she eventually showed the officers a video recording from a camera in her bedroom. The recording was admitted into evidence. It showed defendant running into a bedroom where Alisha was sleeping and dropping an object on the floor, which Alisha carried out of the room a few minutes later. Alisha testified this object was a gun. In the video, defendant appeared to be very upset. He repeatedly fell to ground and appeared to be sobbing at times. He changed his clothing, and Alisha left the room carrying the clothes he had been wearing. After about 10 minutes, defendant and Alisha both left the room.

¶ 17        A recording of a phone conversation between defendant and an unidentified woman on January 25, 2021, was admitted into evidence and played in court. In the recording, defendant indicated that Bell would not get out of his car on the night of the incident. Defendant stated he "upped" the gun just to scare Bell. Defendant believed the gun was on safety, but it went off. Defendant stated the shooting was an accident. Defendant sounded as though he was crying at times during the phone call.

¶ 18        The State rested, and defense counsel moved for a directed verdict. The trial court indicated it was taking the motion under advisement. The court then asked if the defense would be presenting any evidence. Defendant was admonished concerning his right to testify, and defendant indicated he would not be testifying. Defendant presented no evidence.

¶ 19        The jury found defendant guilty of attempted first degree murder and aggravated battery with a firearm. The jury also found the State had proven defendant personally discharged a firearm that proximately caused great bodily harm to another person. After the jury returned its verdict, defense counsel noted he had previously moved for a directed verdict. The trial court stated it was taking the matter under advisement and would issue a written decision shortly thereafter. The court subsequently denied defendant's motion for a directed verdict.

¶ 20        Defendant filed a posttrial motion arguing, *inter alia*, the trial court erred by reserving its ruling on his motion for a directed verdict because it gave him a false impression of the State's evidence during the trial and affected his decision as to whether to testify. Defendant asserted that this uncertainty substantially prejudiced him. The court denied the motion. The court indicated it believed it was a matter of trial strategy for defense counsel not to request a ruling on its motion for a directed verdict and allow the matter to remain under advisement. The

court noted defense counsel could have requested that it rule on the motion if it was crucial to defendant's position as to whether to testify.

¶ 21    The matter proceeded to sentencing. A presentence investigation report (PSI) prepared in advance of the sentencing hearing showed defendant was 40 years old. The PSI indicated defendant had prior felony convictions in Illinois for aggravated unlawful use of weapons and aggravated discharge of a firearm for which he had been sentenced to probation. The PSI indicated defendant also had two federal convictions for unlawful possession of a firearm, and he had received prison sentences for each conviction. Defendant reported he had been diagnosed with schizophrenia and bipolar disorder in 2004. Defendant reported that he had been drinking alcohol since he was 12 years old, and he had been drinking heavily at the time of the offense. He indicated he started using cocaine when he was 20 years old, used it every few days at the time of the offense, and had last used it on the day of the offense. He also indicated he had used ecstasy and cannabis in the past. Defendant indicated he believed he had problems with drugs and alcohol and needed treatment. The PSI reflected that, at the time of the incident, defendant had been employed for approximately 14 months. During that time, defendant held positions as a forklift operator, a picker, and an employee at a car detailing business.

¶ 22    Several of Bell's family members read victim impact statements. The defense submitted three letters of support from defendant's family members. Defendant made a statement in allocution, stating that he was "sorry from the bottom of [his] heart" and that shooting Bell was a "careless mistake."

¶ 23    The trial court sentenced defendant to 50 years' imprisonment for attempted first degree murder. The court did not impose a sentence for aggravated battery with a firearm, as the parties and the court had previously agreed that it merged with the conviction for attempted first

- 8 -

degree murder. The court stated it had considered the factors in aggravation and mitigation, observed the witnesses during the trial, and considered the evidence produced by the State. The court stated: "I don't know how this happened, but I know you pulled a trigger resulting in that horrific damage to your friend." The court noted defendant had four prior gun convictions and found this indicated defendant was a danger to the public such that a 50-year sentence was warranted to protect the public. The court also stated the sentence was to "deter others from playing with guns."

¶ 24       This appeal followed.

¶ 25                              II. ANALYSIS

¶ 26       On appeal, defendant argues (1) the trial evidence was insufficient to prove him guilty of either attempted first degree murder or aggravated battery with a firearm, (2) he was denied a fair trial when the trial court failed to rule on his motion for a directed verdict at the close of the State's evidence, and (3) his 50-year sentence was excessive.

¶ 27                        A. Sufficiency of the Evidence

¶ 28       Defendant argues the trial evidence was insufficient to prove him guilty beyond a reasonable doubt of either attempted first degree murder or aggravated battery with a firearm.

¶ 29                        1. *Attempted First Degree Murder*

¶ 30       Defendant contends the trial evidence was insufficient to prove him guilty of attempted first degree murder because it did not establish that he had the specific intent to kill Bell. Defendant argues the only direct evidence of his mental state was his statement to detectives and a recording of a phone call indicating the shooting was an accident and that he only intended to scare Bell. Defendant further asserts that the circumstantial evidence the State

argued demonstrated a specific intent to kill was "equally consistent" with his theory that he fired the gun accidentally.

¶ 31 When considering a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This means the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "[W]e will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 32 "To secure a conviction for attempted first degree murder, the State must prove that the defendant performed an act that constituted a substantial step toward the commission of first degree murder and that the defendant did so with the specific intent to kill the victim." *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 34; see also 720 ILCS 5/8-4(a), 9-1(a) (West 2020); *People v. Lopez*, 166 Ill. 2d 441, 445-46 (1995) ("[T]he crime of attempted first degree murder requires *** the specific intent to kill ***.").

¶ 33 "[B]ecause intent to kill is a state of mind, it is usually difficult to establish by direct evidence and is typically inferred from the surrounding circumstances." *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 82. Such circumstances include "the character of the attack, the use of a deadly weapon, and the nature and extent of the injuries inflicted." *Reynolds*, 2021 IL App (1st) 181227, ¶ 34; see also *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) ("The specific intent to kill may be inferred so long as the surrounding circumstances show that

the defendant intended the wilfully committed act, the direct and natural tendency of which is to destroy another's life." (Internal quotation marks omitted.)). "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *People v. Mitchell*, 209 Ill. App. 3d 562, 569 (1991).

¶ 34 In the instant case, the trial evidence, when viewed in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt that defendant possessed the intent to kill when he shot Bell. The circumstances surrounding the shooting—including defendant's use of a firearm, the nature and location of Bell's injuries, and defendant's actions after the offense—could reasonably support the conclusion that defendant acted with the specific intent to kill. Specifically, the evidence showed defendant shot Bell in the head at close range. There was an unfired cartridge on the ground outside the car. Based on Alderman's testimony, the jury could have inferred that defendant "racked" the gun to ensure there was a round in the chamber before pulling the trigger, which would be consistent with an intentional firing of the gun. Also, the evidence showed defendant did not call 911 immediately after the shooting. Instead, he went inside his home, changed his clothes, and drove to a location with Alisha to dispose of the gun. Only after they returned from disposing of the gun, approximately 30 minutes after the shooting, did Alisha call 911.

¶ 35 While defendant stated during his interview with the detectives and in a recorded phone call that the shooting was accidental and that he believed the gun was on "safety," the jury was not required to believe defendant's statements. Defendant had previously lied several times during his police interviews concerning his involvement in the shooting, and the jury could have reasonably concluded defendant was lying about the shooting being an accident in an attempt to minimize his culpability. Also, the jury could have found the evidence that defendant racked the

- 11 -

gun and pulled the trigger was inconsistent with his claim that he only intended to scare Bell, as this could have been accomplished by merely pointing the gun at Bell. Additionally, the jury could have reasonably found defendant's decision to attempt to cover up his involvement immediately after the shooting rather than seeking medical attention for Bell was more consistent with the shooting being intentional than accidental.

¶ 36    In his brief, defendant notes that one of the detectives indicated during the third interview that he believed defendant's statement that he did not intend to shoot Bell and that Roman told defendant he had "owned up" to his mistakes. Defendant then cites *People v. Theis*, 2011 IL App (2d) 091080, ¶ 36, for the proposition that the trier of fact may consider statements made by a detective to a defendant during a recorded interview that he believed the defendant. To the extent defendant is arguing that the detectives' comments indicating they believed defendant should have been considered by the jury as evidence that defendant's statement was credible, we reject his argument.

¶ 37    The *Theis* court actually held that an officer may testify concerning statements he made to a defendant during an interview regarding whether the officer believed the defendant only for the limited purpose of "explain[ing] the logic of the interview." *Id.* ¶¶ 36-37; see also *People v. Munoz*, 398 Ill. App. 3d 455, 488 (2010). An officer may not testify as to whether he or she believed a defendant's prior statement when the testimony would serve "no other purpose but to impermissibly comment on the ultimate issue of the defendant's credibility." *Munoz*, 398 Ill. App. 3d at 488 (2010). This is because "[q]uestions of credibility are to be resolved by the trier of fact." *People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989); see also *People v. Davila*, 2022 IL App (1st) 190882, ¶ 52 ("[A] witness is not permitted to comment on the veracity of another

witness's credibility."). Thus, we reject defendant's argument that the detectives' statements during the interview should be considered as evidence that he was credible.

¶ 38                                      2. *Aggravated Battery With a Firearm*

¶ 39            Defendant also argues the evidence was insufficient to prove him guilty of aggravated battery with a firearm because the evidence did not establish that he knowingly fired the gun. However, no sentence was entered on this count, as the trial court found it merged with defendant's conviction for attempted first degree murder. Accordingly, no final judgment of conviction was entered for the charge of aggravated battery with a firearm, and we may not address this issue on appeal. See *People v. Caballero*, 102 Ill. 2d 23, 51 (1984) ("The final judgment in a criminal case is the sentence, and, in the absence of the imposition of a sentence, an appeal cannot be entertained.").

¶ 40                                      B. Motion for a Directed Verdict

¶ 41            Defendant argues the trial court denied him a fair trial by failing to rule on his motion for a directed verdict at the close of the State's evidence in violation of section 115-4(k) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-4(k) (West 2022)). Defendant contends this error prejudicially interfered with his right to testify. Specifically, defendant argues that, by reserving its ruling, the court "left [defendant] playing a 'guessing game' as to the sufficiency of the State's evidence and the cost-benefit analysis of taking the stand."

¶ 42            The State argues defendant has forfeited this issue by failing to object to the trial court's decision to reserve its ruling on the motion for a directed verdict. Defendant contends his failure to object did not result in a forfeiture of the issue because his only burden was to move

for a directed verdict. Defendant asserts he was not required to also "plead" to the court that his decision as to whether to testify hinged upon the court's ruling.

¶ 43    We find defendant forfeited this issue by failing to object when the trial court indicated it would reserve its ruling. "[F]or a criminal defendant to preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion." *People v. Jackson*, 2022 IL 127256, ¶ 15. This is because a defendant's "failure to raise the issue at trial deprives the circuit court of an opportunity to correct the error, thereby wasting time and judicial resources." *Id.* "This forfeiture rule also prevents criminal defendants from sitting idly by and knowingly allowing an irregular proceeding to go forward only to seek reversal due to the error when the outcome of the proceeding is not favorable." *Id.* Accordingly, defendant was required to object to the court's decision to reserve its ruling on the motion in order to preserve his challenge to the timing of the ruling for appeal.

¶ 44    Defendant argues that, in the event we find the issue forfeited, we should review it under the first prong of the plain error doctrine.

> "The plain error rule allows reviewing courts discretion to review forfeited errors under two alternative prongs: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 45 The first analytical step under either prong of the plain error doctrine is determining whether a clear or obvious error occurred. *Id.* ¶ 22. "An alleged error is not clear or obvious if it concerns 'merely arguable issues.' " *In re M.P.*, 2020 IL App (4th) 190814, ¶ 45 (quoting *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 17). Rather, "the error must 'be manifest or patent.' " *Id.* (quoting *Hammons*, 2018 IL App (4th) 160385, ¶ 17). "Plain-error review is reserved for errors that are clear or obvious based on law that 'is well settled at the time of trial ***.' " *People v. Williams*, 2015 IL App (2d) 130585, ¶ 11 (quoting *People v. Downs,* 2014 IL App (2d) 121156, ¶ 20).

¶ 46 We find that, at the time the trial court took the motion under advisement, the law was not sufficiently settled on the issue of whether it was error for a trial court to reserve its ruling on a motion for a directed verdict made at the close of the State's evidence. Defendant contends that reserving a ruling on a motion for a directed verdict at the close of the State's evidence is prohibited by the plain language of section 115-4(k) of the Code, which provides:

> "When, at the close of the State's evidence or at the close of all of the evidence,
> the evidence is insufficient to support a finding or verdict of guilty the court may
> and on motion of the defendant shall make a finding or direct the jury to return a
> verdict of not guilty, enter a judgment of acquittal and discharge the defendant."
> 725 ILCS 5/115-4(k) (West 2022).

We find the above statutory language does not clearly indicate whether a trial court must immediately rule on a motion for a directed verdict. While the statute indicates the court "shall make a finding or direct the jury to return a verdict of not guilty" (*id.*) when the defendant moves for a directed verdict and the evidence is insufficient, it does not expressly indicate whether the court's ruling on the motion must be immediate or whether it may reserve its ruling.

- 15 -

¶ 47        Courts have taken several different approaches to the issue of whether a trial court may reserve its ruling on a motion for a directed verdict at the close of the State's evidence. In *People v. Faulkner*, 64 Ill. App. 3d. 453, 457 (1978), the defendant moved for a directed verdict at the close of the State's evidence on the basis that the State failed to prove an essential element of the offense. The trial court reserved its ruling on the motion and allowed the State to reopen its case to present additional evidence. *Id.* The defendant argued this was improper, and this court held the trial court's ruling was not an abuse of discretion. *Id.* The *Faulkner* court found there was no "[*per se*] rule prohibiting a court from reserving ruling or permitting the State to reopen its case once the defendant has moved for a directed verdict." *Id.*

¶ 48        In *People v. Rascher*, 223 Ill. App. 3d 847 (1992), this court again considered, in *dicta*, the issue of whether it is error for a trial court to reserve ruling on a motion for a directed verdict made at the close of the State's evidence. In *Rascher*, defense counsel moved for a directed verdict at the close of the State's evidence. *Id.* at 849. The trial court reserved its ruling on the motion, reasoning " '[t]here are a lot of things we don't know *** based on this evidence.' " *Id.* The defendant presented no evidence or testimony. *Id.* The trial court ultimately denied the motion after the jury returned a guilty verdict. *Id*. at 849-50. On appeal, the *Rascher* court reversed, holding that the trial evidence was insufficient to prove the defendant guilty of the offense beyond a reasonable doubt. *Id.* at 853.

¶ 49        The court then considered the defendant's argument that the trial court erred by reserving its ruling on his motion for a directed verdict at the close of the State's evidence. *Id*. The *Rascher* court noted the State had argued the defendant was required to show how the trial court's reservation of its ruling prejudiced him in order to establish error. *Id.* at 853-54. The

- 16 -

court then stated: "Here we have concluded the evidence was not sufficient to support the jury's verdict, and the trial court's comments suggest it too found the evidence lacking." *Id.* at 854.

¶ 50      The *Rascher* court found that "[a] trial court should not reserve ruling on a motion for directed verdict at the close of the State's evidence" and that such a practice "could be reversible error in some cases." *Id.* at 855. The court stated that a directed verdict at the close of the State's evidence would have been justified in that case. *Id.* at 854. The *Rascher* court also found the defendant was entitled to a ruling on her motion rather than having to guess as to whether the State had proven its case. *Id.* The court reasoned:

> "A trial judge should not be allowed to circumvent rules of law by postponing a decision on a proper motion [citation]. Under section 115-4(k) of the Code ***, the trial court is obligated to rule on the defendant's motion for a directed verdict. Here, the trial judge did not rule on the motion at the close of the State's evidence or at the close of all the evidence, but instead waited until after the jury verdict to deny the motion. To postpone the ruling makes the trial a guessing game for the defendant. The defendant should not have to guess as to whether the State's evidence was sufficient nor as to whether the trial court expects the defendant to testify." *Id.* at 854-55.

¶ 51      The Third District took a similar approach to *Rascher* in *People v. Trump*, 62 Ill. App. 3d 747, 748 (1978). The *Trump* court held that the trial court did not err by reserving its ruling on the defendant's motion for a directed verdict, which was made at the close of all the evidence. *Id.* The court distinguished that circumstance from cases where defendants move for directed verdicts at the close of the State's evidence. *Id.* The *Trump* court stated a trial court should not be permitted to reserve ruling in such cases because "the defendant ought not to be

- 17 -

forced to decide whether to produce evidence in his defense without knowing that the prosecution's evidence was sufficient." *Id.*

¶ 52    The First District has taken a different approach than the *Rascher* and *Trump* courts in its decisions in *People v. Watkins*, 206 Ill. App. 3d 228 (1990), and *People v. Ramirez*, 244 Ill. App. 3d 136 (1993). In both cases, the courts held that section 115-4(k) of the Code does not require the trial court to rule on a motion for a directed verdict made at the close of the State's evidence immediately, but rather permits the court to rule at the close of all the evidence. *Watkins*, 206 Ill. App. 3d at 243; *Ramirez*, 244 Ill. App. 3d at 150.

¶ 53    After considering the foregoing authority, we conclude the law at the time of trial was not clearly settled as to whether a trial court could properly reserve its ruling on a defendant's motion for a directed verdict made at the close of the State's evidence. While our prior decision in *Rascher* found that a trial court should not reserve ruling on a motion for a directed verdict made at the close of the State's evidence and that such a practice "could be reversible error in some cases" (*Rascher*, 223 Ill. App. 3d at 855), the *Rascher* court did not identify the circumstances it thought *would* constitute reversible error, nor did it indicate whether a showing of prejudice was necessary. As noted, prior to *Rascher*, this court held in *Faulkner* that there is no *per se* rule prohibiting a court from reserving ruling on a directed verdict at the close of the State's evidence. *Faulkner*, 64 Ill. App. 3d. at 457. The *Faulkner* court further held that it was within the court's discretion to not only reserve its ruling on a motion for a directed verdict but to permit the State to reopen its case in the meantime to present additional evidence. *Id.* The First District has held that a trial court may reserve its ruling until the close of all the evidence. See *Watkins*, 206 Ill. App. 3d at 243; *Ramirez*, 244 Ill. App. 3d at 150.

¶ 54    Because the law on the subject was not well-settled at the time of trial, we cannot say the trial court's decision to reserve its ruling on defendant's motion for a directed verdict at the close of the State's evidence constituted a "clear or obvious error." See *M.P.*, 2020 IL App (4th) 190814, ¶ 45; *Williams*, 2015 IL App (2d) 130585, ¶ 11. Accordingly, this issue is not reviewable under the plain error doctrine.

¶ 55                                    C. Sentencing

¶ 56    Defendant argues the 50-year prison sentence imposed by the trial court was excessive because he had no history of harming others, he was unlikely to survive the sentence, and the evidence at sentencing did not indicate he was without rehabilitative potential.

¶ 57    "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because the trial court has the opportunity to observe the defendant and the proceedings and, accordingly, has a better opportunity than the reviewing court to assess relevant sentencing factors, like the defendant's credibility, demeanor, character, mentality, social habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). The reviewing court may not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 58    The trial court is required to consider the statutory factors in aggravation and mitigation when imposing the sentence. 730 ILCS 5/5-5-3.1(a), 5-5-3.2(a) (West 2022). Also, pursuant to the Illinois Constitution, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. However, while a sentencing court is required to consider a defendant's rehabilitative potential, it is not required to give greater weight to rehabilitative

potential than to the seriousness of the offense or other aggravating factors. *People v. Tye*, 323

Ill. App. 3d 872, 890 (2001). Moreover, "the court need not recite and assign a value to each

factor it has considered." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38.

¶ 59         "A reviewing court may not alter a defendant's sentence absent an abuse of

discretion by the trial court." *Alexander*, 239 Ill. 2d at 212. "[A] sentence within statutory limits

will be deemed excessive and the result of an abuse of discretion by the trial court where the

sentence is greatly at variance with the spirit and purpose of the law, or manifestly

disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 60         Here, the trial court did not abuse its discretion by sentencing defendant to 50

years' imprisonment. The court's sentence was well within the statutory range of 30 years to life

imprisonment. See 720 ILCS 5/8-4(c)(1)(D), 9-1(a)(2) (West 2020); 730 ILCS 5/5-4.5-25(a)

(West 2022). The court indicated it had considered the statutory factors in aggravation and

mitigation. The court properly found defendant's criminal history, which included four prior

gun-related offenses, to be an aggravating factor (see 730 ILCS 5/5-5-3.2(a)(3) (West 2022)).

The court indicated this prior record showed defendant was dangerous and the public needed to

be protected from him. The court also stated the sentence was necessary to "deter others from

playing with guns." Given defendant's criminal history and the need for deterrence, we find the

50-year sentence of imprisonment was not "greatly at variance with the spirit and purpose of the

law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 61         In reaching our holding, we reject defendant's argument that the trial court should

have considered his intoxication at the time of the offense, his history of substance abuse, and his

history of mental illness to be mitigating factors. While the court did not expressly indicate that it

found these things to be mitigating, nothing in the court's comments during sentencing indicated

it did not. Accordingly, to the extent these matters were proper mitigating evidence, we presume the court considered them. *People v. White*, 237 Ill. App. 3d 967, 970 (1992) ("Absent any indication in the record to the contrary, it is presumed that the trial court considered evidence presented in mitigation."). We also note that the court was not required to find defendant's history of substance abuse or mental illness to be mitigating, and it would have been within its discretion in finding they were not. See *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105 ("[A] history of substance abuse is a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor."); see also *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 44 ("[A] defendant's mental or psychological impairments are not inherently mitigating.").

¶ 62        We reject defendant's argument that the trial court abused its discretion by sentencing him to a term of imprisonment that he was unlikely to survive because there was no evidence he was irredeemable or without rehabilitative potential. Defendant cites no authority indicating there must be a showing that an adult defendant is devoid of rehabilitative potential before the court may properly impose such a sentence. Also, while the sentencing evidence may not have shown defendant was completely without rehabilitative potential, the court could have reasonably concluded from the evidence that defendant's rehabilitative potential was negligible. Defendant had previously been convicted of four gun-related offenses and, as a result of these convictions, had served two terms of probation and two terms of imprisonment. He was apparently not deterred or rehabilitated by his prior sentences, however, as he possessed and discharged a firearm in the instant case, causing extensive injuries to Bell. We conclude the trial court did not err in imposing the 50-year sentence given the sentencing range and aggravating factors it found were present.

¶ 63                                III. CONCLUSION

¶ 64        For the reasons stated, we affirm the trial court's judgment.

¶ 65        Affirmed.